FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ APR 29 2008 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------X

UNITED STATES OF AMERICA,

      - against -

TIN YAT CHIN,

               Defendant-Movant.

------------------------------------------------------X

No. 08-CV-
No. 01-CR-01407 (FB)

08 - 1735

BLOCK, J.

J. ORENSTEIN, M.J.

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT-MOVANT TIN YAT CHIN'S PETITION PURSUANT TO 28 U.S.C. §2255

Respectfully submitted,

JOSHUA L. DRATEL
JOSHUA L. DRATEL, P.C.
2 Wall Street
3rd Floor
New York, New York 10005
(212) 732-0707

*Attorneys for Defendant-Movant*
*Tin Yat Chin*

— Of Counsel —

Joshua L. Dratel
Alice L. Fontier

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X

UNITED STATES OF AMERICA,                    No.08-CV-_____
                                             No.01-CR-01407 (FB)
             - against -

TIN YAT CHIN,

                 Defendant-Movant.
-------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT-MOVANT
## TIN YAT CHIN'S PETITION PURSUANT TO 28 U.S.C. § 2255

### Introduction

This Memorandum of Law is submitted in support of Defendant-Movant Tin Yat Chin's

petition, filed pursuant to 28 U.S.C. § 2255, to vacate his conviction and sentence.  Mr. Chin is

currently incarcerated at FCI Fort Dix, serving a sentence of one hundred and thirty-five (135)

months imprisonment imposed February 15, 2006.

For the reasons set forth below, it is respectfully submitted that Mr. Chin's conviction and

sentence should be vacated because evidence discovered post-trial demonstrates that Mr. Chin is

actually innocent of the charges.  Therefore his continued imprisonment violates his rights under

the Fifth and Eighth Amendments, and is a miscarriage of justice.  28 U.S.C. § 2255(a) and

*Herrera v. Collins*, 506 U.S. 390, 404-05 (1993).  Alternatively, Mr. Chin asks this court to

vacate his conviction and sentence because he was denied his Sixth Amendment right to effective

assistance of counsel.

The prosecution's case against Mr. Chin detailed two fraudulent schemes in which a

swindler posed as an immigration attorney claiming that he could obtain work visas that allowed

people to enter the United States. The prosecution's evidence consisted entirely of witness testimony and receipts retained by those witnesses. Government agents scoured Mr. Chin's life and financial records, and found no physical evidence against him. There was no evidence of financial proceeds of the fraud or any other physical evidence linking Mr. Chin to the fraud. Additionally, several witnesses did not identify Mr. Chin as the perpetrator. While others did, their testimony was tainted by media coverage, the conduct of government agents, and false or misleading information from relatives.

Newly discovered evidence indicates that the real swindler is likely Frank Kan. The government argued that the swindler made several trips to China in order to make his scheme appear legitimate. It is undisputed that the swindler was in China in July and August 1999. The newly discovered evidence – in the form of affidavits, a log book, and a receipt – conclusively demonstrates that Mr. Chin was in Flushing, New York in July and August 1999, and thus cannot be the swindler.

**Procedural History**

Mr. Chin was initially charged, by indictment filed December 17, 2001, with a single count of impersonating a federal employee, namely an officer of the United States Department of Justice, Immigration and Naturalization Service ("INS"). A superseding indictment filed April 1, 2002, added three counts of tax evasion for the tax years 1997, 1998, and 1999, based on the failure to report income derived from the fraudulent scheme. The charges related to two fraudulent schemes in which a swindler posed as an INS employee who promised to obtain work visas quickly for Chinese citizens in exchange for vast sums of money.

Mr. Chin, denied any involvement in the fraud, and maintained that he had been falsely

-2-

identified. He proceeded to jury trial January 6, 2003, and was found guilty of one count of impersonating an employee of the United States, in violation of 18 U.S.C. § 912, and three counts of tax evasion, in violation of 26 U.S.C. § 7201. On September 12, 2003, judgment of conviction was entered in the United States District Court for the Eastern District of New York, and Mr. Chin was sentenced to 120 months imprisonment, three years supervised release, and restitution of $653,450.00.

In his appeal to the Second Circuit, Mr. Chin argued that, among other issues, the District Court had improperly precluded several credit card receipts that demonstrated that Mr. Chin was in Queens, New York, at the time the government alleged that he was in China. Agreeing with Mr. Chin, the Court reversed the conviction in a June 2, 2004, opinion. *United States v. Chin*, 371 F.3d 31 (2d Cir. 2004). Re-trial on identical charges commenced February 10, 2005. On March 10, 2005, following four days of deliberation, Mr. Chin was found guilty on all counts. Nearly a year later, on February 15, 2006, Mr. Chin was sentenced to 135 months imprisonment, three years supervised release, and restitution of $989,567.00.

Mr. Chin subsequently filed an appeal challenging the February 15, 2006, conviction and sentence. On January 30, 2007, the Second Circuit affirmed the judgement of the District Court in all respects. *United States v. Chin*, 476 F.3d 144 (2d Cir. 2007). Mr. Chin now files this timely petition pursuant to 28 U.S.C. § 2255 to vacate his conviction and sentence.

### Statement of the Facts

The allegations against Mr. Chin detailed a scheme to defraud people of large sums of money by falsely claiming, under two aliases, that he could quickly obtain "work visas" that would allow Chinese citizens to enter and live in the United States. The government claimed

that Mr. Chin effectuated this fraud by posing, as an INS employee, an immigration attorney, and/or a former Chinese consulate employee at various times from March 1997, through August 1999.

The government further claimed that, to lend legitimacy to this scheme, Mr. Chin rented apartments at three different locations in Brooklyn and set them up to appear as offices; hired two secretaries; traveled to China on multiple occasions; and created or obtained various official-looking plaques, documents, and an INS badge.  He is alleged to have defrauded multiple people of nearly a million dollars and to have done all of this under various pseudonyms.

In addition, due to the extent to which the evidence contradicted the government's theory, the government was compelled to argue that Mr. Chin, a native Cantonese speaker, had successfully tricked at least twenty people into thinking he was a native Mandarin speaker (because the swindler spoke Mandarin Chinese); that he avoided detection by fingerprint evidence by having the foresight to hold all documents between his knuckles; that he used a mystery accomplice to purchase goods at various stores in Queens using his credit card by forging his signature while he was actually in China; that he convinced his brother, wife, and neighbor to commit perjury by testifying to a false alibi; and that he managed to hide the proceeds of this fraudulent scheme so thoroughly that the government has yet to recover *any* of the money.

Mr. Chin has consistently maintained that he is not guilty of these charges and has been falsely identified by the government's witnesses.  Mr. Chin stated persistently that he is a native Cantonese speaker, with limited ability in Mandarin.  An expert testified that Mr. Chin would have been unable to speak Cantonese with a Mandarin accent, as the witnesses said the swindler

-4-

had done.  Further, Mr. Chin argued that he could not have been the swindler because evidence –

in the form of authenticated credit card receipts – showed that he was in New York in July and

August 1999, the period the swindler had gone to China.

The defense highlighted numerous problems with the witnesses' identifications of Mr.

Chin as the swindler.  For instance, one witness identified a United States Marshal as the

swindler, and others stated that the swindler was not present.  Additionally, the defense

emphasized that many of the identification witnesses were themselves implicated in a scheme to

corruptly pay off INS officials in order to circumvent immigration rules, and that some of these

witnesses – far from being naive innocent victims – actively defrauded others and

opportunistically cast the blame on Mr. Chin.  Corroborating his argument that Mr. Chin was

misidentified, the defense pointed out that although fingerprints were recovered, they did not

belong to Mr. Chin.

The defense theory was advanced through cross-examination, through witnesses called to

authenticate the relevant credit card receipts and the signatures, and through Mr. Chin's wife and

brother.  Mr. Chin's wife and brother both testified that Mr. Chin was a native Cantonese speaker

and that they would have known if Mr. Chin had traveled to China.  The defense also called a

witness who testified that Mr. Chin was responsible for driving his daughter and other students to

school during the period when he was supposedly involved in perpetrating the fraud.

Moreover, a linguistics expert testified regarding the differences between the Cantonese

and Mandarin languages, and identified Mr. Chin as a native Cantonese speaker.  Based on her

experience with languages and on her interaction with Mr. Chin, the language expert testified

that it would have been highly unlikely that Mr. Chin could have successfully adopted a

-5-

Mandarin accent.

In order to demonstrate the importance of the newly discovered evidence, the trial evidence must be described in some detail. Mr. Chin has always maintained that he was misidentified, therefore the various identifications must also be discussed.

**A.      *The Government's Case***

The government's witnesses testified to two different fraudulent schemes, conducted allegedly by Mr. Chin, operating under two different aliases – "Mok Wah" and "Tan C. Dau" as follows:

**1.      *Mok Wah***

**a.      *The Mok Wah Transactions***

In March, 1997, Sui Seng Wong rented a second floor apartment at 2347 86th Street in Brooklyn to a man who identified himself as Mr. Zhao.[1] T. 684-86.[2] Lai Fan Lok Iao ( "Ah Lai") worked answering the phone for a man who identified himself as Mok Wah in an office at 2347 86th Street in Brooklyn. T. 718, 721. Ah Lai started working for Mok Wah in April 1997, and stayed for eight to ten months. T. 718, 721, 742. She was present on numerous occasions when clients came to the office. T. 721-22. Ah Lai stated that Mok Wah usually spoke Mandarin with clients, although he sometimes spoke Cantonese poorly. T. 747.

In March 1997, Mok Wah approached Hui Chang Situ ( "Situ") on 86th Street in Brooklyn, and asked for directions to a local garment factory. T. 763-64. He mentioned that he

---

[1] That government argued that Mr. Chin rented the apartment using the alias "Mr. Zhao."

[2] "T." refers to the transcript at the second (2005) trial. References to the first trial, which occurred in 2003, are designated as "2003 Trial T."

had helped an employee immigrate from China using a work visa, and that he specialized in helping Chinese immigrants because he had connections at the Chinese consulate. T. 766. Situ, who wanted to get a visa for her brother, went to Mok Wah's office on 86th Street, where she was apprised of the requirements for receiving a visa. Situ agreed to the terms and began paying Mok Wah. T. 767-768. Later, Situ introduced Mok Wah to her sister-in-law's husband, Yi Zheng Chen ( "Chen"). T. 765.

Hui Ci Tan ( "Ah Ci") was referred to Mok Wah by Chen. T. 816-17. Mok Wah told her that, although he could help her get visas, she needed to move quickly because if he filled his quota he could not apply for any more visas. T. 817 He told her he knew people in INS and that he worked there. T. 820. Ah Ci became extensively involved with Mok Wah, recruiting several acquaintances, including Ah Hong, Feng Jun Yu Tan, and "Aunt Eng." T. 826, 840-41.

Ah Ci visited Mok Wah's office several times to pay cash for assorted applications. T. 833, 836. She spoke to Mok Wah in Cantonese, although Mok Wah spoke Cantonese very poorly. T. 889. In January, 1998, Mok Wah told Ah Ci that the visas were ready and that he would be going to China. T. 842. Ah Ci also went to China to help her relatives prepare for the trip. T 843. While there, they met at a hotel in Quong Soe, and she gave him a total of $110,000.00 in cash for approximately eighteen family members. T. 846-848.

### b.   *The Mok Wah Identifications*

#### i.   *Sui Seng Wong – "Mr. Wong"*

Sui Seng Wong ( "Mr. Wong") owns the building located at 2347 86th Street in Brooklyn, New York. T. 684. In March 1997, Mr. Wong rented an apartment on the second floor to a man he knew as Mr. Zhao. T. 685-686. Mr. Wong met with Mr. Zhao before he rented the apartment

-7-

and then again every month for the next ten or eleven months. T. 688. Mr. Wong stated that he was not sure if Mr. Zhao was in the photo array. T. 691. Moreover, remarkably, during the first trial (hereafter "2003 trial") Mr. Wong left the witness stand and walked around the courtroom, looking closely at everyone in the courtroom, including Mr. Chin, until he was satisfied that Mr. Zhao was not in the courtroom. T. 692-693.

### ii.  *Hua Ci Chen – "Ah Ci"*

Ah Ci met Mok Wah in March or April 1997. T. 816. The first time she met Mok Wah she agreed to hire him to obtain work visas for her family. T. 821-823. Ah Ci worked closely with Mok Wah for almost a year, including taking a trip to China in February 1998. T. 846. She introduced many people to Mok Wah and met with him individually on numerous occasions. T. 826. When Ah Ci was asked to view a photo array she indicated that number five (Mr. Chin) looked like Mok Wah because his nose looked similar. T. 825-826. However, during the 2003 trial, after walking around the courtroom carefully examining everyone including Mr. Chin, she identified United States Marshal Joseph Wong as Mok Wah. T. 880-882. Unsurprisingly, two years later, at the second trial (hereafter "2005 trial"), Ah Ci was able to point out the only Chinese man in the courtroom, Mr. Chin, as Mok Wah.

### iii.  *Jia Sheng Tan*

Jia Sheng Tan met Mok Wah approximately Labor Day of 1997. T. 904. When he was shown the photo array in November 2002, the agents told him to "recognize Mok Wah." 2003 Trial T. 1293. Following directions, he then chose photograph number five. T. 907. However, during the 2003 trial Jia Sheng Tan looked around the courtroom and could not identify *anyone* as Mok Wah. T. 906-907.

-8-

### iv.    *Lai Fan Lok Iao – "Ah Lai"*

Ah Lai was hired by Mok Wah in March 1997, to work as his secretary. T. 718. She worked in his office Monday through Thursday for almost a full year. T. 744. She was his only employee and saw him countless times. T. 744. Ah Lai was vary familiar with Mok Wah, yet when she viewed the six picture photo array, on December 11, 2001, she indicated that she could not be certain Mok Wah was one of the six people pictured. Ah Lai described photograph number five, stating "my former employer looks like the person in the photo but I am not sure." *Witness Identification Response* (a copy of which is attached to this Petition as Exhibit 1).

### v.    *Yi Zheng Chen*

Yi Zheng Chen met Mok Wah in March, 1997. T. 791-92. He rode in his car and subsequently went to his office to bring him money. T. 792-93. Mr. Chen then saw Mok Wah on two other occasions. Mr. Chen testified that on the last of these occasions he was became involved in a physical altercation with Mok Wah. T. 800, 802-3. After these close and repeated contacts with Mok Wah, Mr. Chen viewed the photo array and informed the agents that he did not recognize *any* of the photos. T. 809. Despite being unable to identify a photograph, two years later Mr. Chen pointed out Mr. Chin in court.

### vi.    *Hui Chang Situ – "Situ"*

Situ was told by Mr. Chen that government agents were coming to interview her about Mok Wah. T. 780. She was informed that Mok Wah had been arrested and that she had to identify his picture. T. 781-82. The agents then showed her a photo array, and after five minutes of deliberation she decided that number five was Mok Wah. T. 781.

### vii.    *Witnesses Who Identified Mr. Chin*

*for the First Time In February 2005*

Several other individuals claimed to have been victims of Mok Wah, but acknowledged

that they had never spoken to law enforcement from 1997, until shortly before the (second) trial

in 2005.  T. 932-36 (Feng Ya Situ); T. 942-55 (Yong Ai Zhou); T. 964-75 (Li Hua Mei); T. 978-

88 (Qi Qiu Mei); and T. 994-1006 (Qui Shan Mei).  Each of these individuals identified Mr.

Chin from a photo array in 2005, albeit after the case had received substantial news coverage.  In

fact, Yong Ai Zhou testified that she contacted the authorities in February 2005, only after and

because she saw in the newspaper Mr. Chin's photo accompanying an article stating he had been

charged as Mok Wah, and that people were testifying against him. T. 958-959.  Indeed, Yong Ai

Zhou identified Mr. Chin's photo February 21, 2005, after reading the article, and after the trial

had already begun. T. 960.

**2.    *Tan C. Dau***

**a.    *The Tan C. Dau Transactions***

In October of 1998, Lolita Eng, the property manager of 7709 4th Avenue in Bay Ridge,

Brooklyn, rented a first floor apartment to a man she knew as Jun Li.[3]  T 56-57. Wan Yi Li (

"Winnie") worked as a secretary for Tan C. Dau at 7709 4th Avenue, Apartment A4, for about a

year. T. 92, 121. Mr. Tan told her that he was an attorney who helped people with immigration

status and that her main job would be to translate Cantonese, because he did not speak Cantonese

well. T. 90. She spoke to him in Mandarin, and when he occasionally spoke Cantonese, he did

so poorly and with a Mandarin accent. T. 158. Feng Ying Su Huang ( "Mrs. Huang") met Tan

Dau when he responded to an advertisement she had placed for an apartment in her house. T.

---

[3] The government alleged that Mr. Chin used the alias "Jun Li" to rent the apartment.

200, 202.  Mr. Tan mentioned that he had worked at INS and was able to bring immigrants from

China by means of work visas.  T. 201, 204.  Mr. Tan stated that an individual visa would cost

$30,000.00, with an entire family costing $43,000.00.  T. 205.  Mr. Tan told Mrs. Huang that he

had to meet a quota for visa applications and told her to recruit friends and relatives.  Mr. Tan

offered to pay her $1,000.00 for each person she recruited and told her not to bring the people to

his office because he was afraid of investigation.  T. 263-266.  Mrs. Huang denied accepting

money, but quickly set to work recruiting people.  T. 264.

Among Mrs. Huang's recruits were her sister-in-law, Xin Yun Cai, Mr. and Mrs. Wong,

Mr. and Mrs. Guang, Ho Je, and Mr. "Beansprout" Chen, who owned a beansprout store in

Chinatown, and who, in turn, referred numerous friends and family members.  T. 547 (Cai);  T.

224 (Huang);  T. 219, 227 (Chen).  Mrs. Huang initially collected $5,000.00 from each of her

recruits, gave Mr. Tan $1,200.00 for each, and kept the remainder of the money.  T. 220.

Although she acknowledged that Mr. Tan had informed her that the money had to be paid to the

consulate in China, she denied any knowledge of wrongdoing and assured all of her recruits that

Mr. Tan was a legitimate attorney.  T. 281-82.

Chau Hoang Dang ("Mrs. Dang"), another of Mrs. Huang's recruits, met personally with

Mr. Tan at the 4th Avenue office in November 1998.  T. 232-33 (Huang);  T. 342 (Dang).  Mr.

Tan told Mrs. Dang about his connections to the consulate and reiterated that he had to fill a

quota before he could get any visas.  T. 344-347.  Although Mrs. Dang recruited several people,

including her sister in law, Mr. Tan continued calling her over the next few months requesting

more money and telling her to recruit more family members.  T. 355.

A few family members asked to meet Mr. Tan, but he told Mrs. Dang that she was not

supposed to bring anyone to the office because the visitor might be an "undercover." T. 356, 432. Mrs. Dang collected more than $85,000.00 from her recruits and gave it to Mr. Tan. T. 446-47. Despite the enormous sums of money she was handling, she claimed it never crossed her mind that Mr. Tan was doing anything illegal by paying cash to his connections at the consulate. T. 446-47.

Mr. Tan reportedly traveled to China in February 1999, to obtain signatures for the visas, but returned without the visas. Citing several problems, he demanded more money, which Mrs. Huang and Mrs. Dang collected from their recruits. In June, 1999, Mr. Tan returned to China, as did Winnie Li and Mrs. Dang, although they did not all travel together. T. 245 (Huang); T. 383 (Dang); T. 106-08 (Li)). Mrs. Dang had a series of meetings with Winnie Li – usually in hotel bathrooms – during which Mrs. Dang delivered large sums of cash. T. 389, 453 (Dang); T. 117-18, 120, 124-29, 135-37 (Li).

While in China, Mrs. Dang raised additional money (approximately $150,000.00), some of which she gave personally to Mr. Tan, the remainder of which she gave to Winnie Li. T. 398, 406-07 (Dang). Mrs. Dang claimed to have personally given Mr. Tan more than $100,000.00 while some of her relatives had paid more than $200,000.00. T. 417. Jin Quan Xian, one of her relatives in China, testified that, he also delivered between $200,000.00 and $300,000.00 in cash to Mr. Tan when they met in China. T. 524.

In a separate set of transactions, Zhi Jian Xie ("Mrs. Xie") became involved in a similar scheme with Mr. Tan and recruited several of her friends and relatives. Mrs. Xie met Mr. Tan on a street corner in Brooklyn when he asked her for directions and added that he was an attorney, with ties at the consulate in China, who could help get work visas using his connections. T. 579-

-12-

81. She recruited several acquaintances, namely Xen Qun Feng and Li Zhen Zheng, and they

agreed to use Mr. Tan to get visas for their family members. T. 587-88. Mrs. Xie acknowledged

that she never told any of the people she recruited that she had just met Mr. Tan on the street that

day, that she engaged in clandestine cash transactions with him at fast food restaurants, or that

she had never done anything to ensure that his claims were legitimate. T. 614-16.

        b.    *The Tan C. Dau Identifications*

           i.    *Cha Huang Dang – "Mrs. Dang"*

The investigation of Mr. Chin began with Cha Huang Dang. Mrs. Dang was intricately

involved in the fraudulent scheme with Mr. Tan. She testified that she provided him with cash

payments of nearly $300,000.00. T. 360 - 398, 425. Mrs. Dang plied the money from her friends

and relatives under the guise that she was working with a legitimate attorney. T. 355-6, 375, 440,

444-6. After her initial meeting with Mr. Tan she was informed by him that she was not to bring

any people to his office because he was concerned that "undercovers" would be coming to

investigate his business. T. 429.

Mrs. Dang agreed to work with Mr. Tan and then  recruited thirty-nine unsuspecting

victims. T. 436. Mrs. Dang recruited victims from across the country: from New York,

California, Connecticut, and Pennsylvania. T. 435. She collected money from her victims in the

United States, then traveled to China in June 1999. T. 383. There she collected another

$150,000.00, which she secreted to Winnie Li in a hotel bathroom. T. 389, 391, 453 (Dang); T.

117-18, 120, 124-29, 135-37 (Li). Mrs. Dang took hundreds of thousands of dollars from

members of her family and other friends and relatives – none of which has been returned.

Despite her role as Mr. Tan's chief recruiter, Mrs. Dang was not asked to view a photo

array.  Nor was she asked to identify him in a line-up.  By the time Mrs. Dang reported the crime

she had already decided to blame Mr. Chin.  In fact, Mrs. Dang served as the catalyst for the

investigation of Mr. Chin in 1999, when she read a newspaper article about Mr. Chin's prior

conviction and took his photo to the agents, accompanied by her tale of victimization.  T. 426.

### ii. *Feng Yi Su Huang – "Mrs. Huang"*

Mrs. Dang's partner, Mrs. Huang, soon followed suit and identified Mr. Chin as the

perpetrator of the fraud.  Mrs. Huang began her working relationship with Mr. Tan in October

1998.  T. 215.  She quickly recruited Mrs. Dang to join the scheme.  T. 335.  Together Mrs.

Huang and Mrs. Dang recruited the vast majority of the victims of this fraudulent scheme.  Mrs.

Huang was the face of the scheme in the community.   She held meetings at her house at which

she explained the scheme to potential victims, assuring them that everything was legitimate.  T.

219-20.  She then began extracting money from people.

Mrs. Huang received a sum approximating $200,000.00 from her recruits.  Not only did

she receive payments and transfer them to Mr. Tan, but she also demanded deposits from people,

which monies she then stockpiled in her own home.  T. 221.  Mrs. Huang's participation was

crucial to the success of the scheme because the payments went to her and it was her that the

community knew and trusted.

Despite these patently illegal actions Mrs. Huang and Mrs. Dang have never been arrested

or charged with a crime.  Instead Mrs. Huang and Mrs. Dang were the government's key

witnesses.  They have pointed the finger of blame at Mr. Chin and cast themselves as innocent

naive dupes who were cajoled out of their life savings through deceit and contrivance.  Mrs.

Huang's and Mrs. Dang's tale of innocent woe is little more than a myth they have perpetuated at

-14-

the expense of an innocent man's liberty. The inaccurate, biased, and unreliable identifications of the other witnesses are proof that their tale is unsupported by reality.

### iii.   *Yee Wan Chan and Lolita Eng*

Yee Wan Chan lived at 7709 4th Avenue in Brooklyn at the same time that a person she knew as Jun Li rented an apartment in the building. T. 1341. The government argued that Mr. Chin rented the apartment masquerading as Jun Li. Yee Wan Chan showed the apartment to Jun Li; wrote down information from a Chinese passport in his name and took the $100.00 deposit for the apartment. T. 1343. During the year that Mr. Li rented the apartment she had multiple opportunities to see him. Yet, after living in the same building as Mr. Li and renting him his apartment, Yee Wan Chan did not identify the photo of Mr. Chin as Jun Li and she did not identify him in court. T. 1348.

Lolita Eng managed the building located at 7709 4th Avenue. T. 54. After Yee Wan Chan showed the apartment to Mr. Li, Lolita Eng met him one time to sign the lease and give him the key. T. 63. The meeting was very brief and Mr. Li stated that he was in a hurry. T. 64. The only other time that Ms. Eng saw Mr. Li she passed him in the hallway and again he appeared to be in a hurry. T. 70. Based only on these two very brief encounters with Mr. Li in 1998, Ms. Eng identified Mr. Chin as Mr. Li in 2001 in the photo array and then again at trial.

### iv.   *Michelle Huang*

Michelle Huang met Tan C. Dau when she was with her mother, Mrs. Huang. T. 1352. The first time she met Mr. Tan she spent about an hour with him at a diner. T. 1352. She met him again at his office, where she stayed for about a half an hour. T. 1353. After these two extended meetings Michelle Huang was unable to identify anyone in court as Tan C. Dau. T.

1355-1356.

### v.   *Wan Yi Li - "Winnie"*

Winnie Li worked with Tan C. Dau as his secretary for almost a year. T. 87-88. She was hired primarily to translate for Mr. Tan because he did not speak Cantonese very well. T. 158. Winnie worked with Mr. Tan almost daily for several months. Additionally, she traveled to China in the summer of 1999 to conduct business for Mr. Tan. T. 105. Incidentally, this business involved clandestine meetings with Mrs. Dang in hotel bathrooms where Winnie collected hundreds of thousands of dollars in cash. T. 161. Also during that trip Winnie flew back and forth from Guangzhou to Shanghai to meet Mr. Tan in the airport and drop off the cash she had collected from Mrs. Dang. T. 112 - 121. After all of these contacts with Mr. Tan, after working directly for him on a daily basis for months, Winnie informed the agents November 20, 2001, that number five in the photo array "looked like" Mr. Tan. T. 168-9. However, she was not certain.

### vi.   *Jin Quan Xian and Jane Xie*

Jin Quan Xian and Jane Xie both testified that they contacted Agent Chiu – the lead FBI case agent assigned to the investigation – because they saw Mr. Chin's photo in the newspaper and read that he had been arrested for a fraudulent immigration scheme. T. 521 (Xian); T. 620 (Xie). Mrs. Xie further testified that when she met with the agents they showed her the photo array and asked her "which of these pictures is the person who swindled money from you?". 2003 Trial T. 972. As would be expected, Mrs. Xie identified the man whom she had just seen in the newspaper.

Similarly, Mr. Xian testified that had seen two articles about the swindle, containing two

pictures of Mr. Chin, and then he contacted the agents. T. 521, 525.  When Mr. Xian met with

agents he identified the photo of the man he had just seen in the newspaper.  In addition, Mr.

Xian admitted that he contacted the agents and was testifying because he hoped to have his

money returned. T. 527.  Neither Mrs. Xie or Mr. Xian had ever reported having tens of

thousands of their hard-earned dollars stolen from them prior to reading about the scam in the

newspaper. T. 525.

### vii.   *Li Zhen Zheng and Guo Hue Zheng*

Li Zhen Zheng met Mr. Tan one time for about twenty minutes in her living room in

August or September, 1998. T. 649.  The entire time he was in her living room Mr. Tan wore

large black sunglasses. T. 663.  During this twenty minute conversation, Guo Hue Zheng

("Dan") walked through the living room four or five times. T. 673.  Dan never stopped to speak

to Mr. Tan and never had any direct contact with him.

In April 2002, government agents came to Mrs. Zheng's house to discuss the case with

her. T. 663.  Prior to their arrival however, Mrs. Xie had called and informed Mrs. Zheng that

Mr. Tan had been arrested and that the agents were going to question her about him. T. 664.

Three and a half years after a single brief encounter with Mr. Tan, and after learning that the

person believed to be Mr. Tan had been arrested, Li Zhen Zheng and Dan Zheng both identified a

photograph of Mr. Chin.

### viii.   *Xin Yun Cai*

Xin Yun Cai is Mrs. Huang's sister-in-law. T. 546.  She met Mr. Tan through Mrs.

Huang and knew that Mrs. Huang was recruiting other people to hire Mr. Tan. T. 546-547.  Mrs.

Cai admitted that Mrs. Huang was in trouble in the community and that people were blaming her

-17-

for taking money from them.  T. 566.  Mrs. Cai met Mr. Tan in August, 1998, and again about a

month later.  T. 546.  Prior to meeting with the agents in this case, Mrs. Cai had been informed

by Mrs. Huang that Mrs. Huang had identified a photograph of Mr. Tan from the photo array.  T.

570.  Armed with that information, Mrs. Cai picked out a photo, despite having met Mr. Tan only

for a few minutes years earlier.

ix.   *Jade Dang*

Jade Dang, Mrs. Dang's sister-in-law, identified Mr. Chin in the photo array as being the

person she knew as Mr. Tan.  However, Jade Dang saw Mr. Tan once in 1999 for approximately

ten to fifteen minutes.  One and a half years later she identified a photograph of Mr. Chin, and

two years after that she identified him in court for the first time.  T. 471-72.  She had no other

contact with Mr. Tan.  T. 472.  Additionally, Jade Dang claimed that she could remember Mr.

Tan and identify him after such a brief encounter because she recognized his special "single

eyelid" and "eagle" nose.  T. 467.  Although these physical traits stood out in her mind and

compelled her to testify in court, she failed to mention these traits to the agents, and no other

witness mentioned any similar trait on Mr. Tan.  T. 481.

**B.**   *The Defense Case*

Mr. Chin has consistently denied participation in this scheme.  In the three years that the

swindler was working his scheme, Mr. Chin was a stay-at-home dad.  He took his young

daughter to school and sometimes helped his wife at her shop on Canal Street.  His family

subsisted on a meager income and was able to maintain its modest way of life primarily through

the assistance of Mr. Chin's siblings.  Central to Mr. Chin's defense was proof that he was in

Flushing, New York, during the summer of 1999, the period when Mr. Tan was in China.  In

-18-

order to demonstrate these facts, Mr. Chin called several witnesses at trial.

Lorna Drew-Monteroso, a high school teacher, and neighbor of Mr. Chin, testified that her son was friends with Mr. Chin's daughter and they frequently spent time together. T. 1189. In the summer of 1999, she and Mr. Chin had a car-pool arrangement for their children and she saw Mr. Chin almost every weekday of that summer. T. 1190-91.

Sui Ngan Cho testified that she had been married to Mr. Chin for fifteen years, and that they lived in a two-family house in Flushing, New York, from which they derived some rental income. T. 1203-06. She and her husband spoke only Cantonese, as it was their native language, although she had heard him speak Mandarin at times. T. 1204-05. In 1997 through 1999, Mr. Chin stayed at home and cared for their young daughter. T. 1213. She saw him every night when she got home from work. T. 1215. To her knowledge, Mr. Chin had not traveled outside the United States between 1977 and 1999. T. 1214. Moreover, Mrs. Chin is a scrupulous record keeper and retained all of the family's credit card receipts. T. 1217-20. Several of the receipts that Mrs. Chin had retained were from the summer of 1999 – the time period that Mr. Tan was in China. She identified her husband's signature on the receipts and stated that she had not signed his name on any of them. T. 1219, 1221.

Mr. Chin's brother Tin Sak Chin ("Dr. Chin"), a professor of psychiatry at New Jersey Medical School, testified that Mr. Chin was born in Hong Kong and had lived in New York since 1966. T. 1259-60. Mr. Chin grew up speaking Cantonese, and no family member spoke Mandarin. T. 1261-62. Dr. Chin had heard Mr. Chin speak Mandarin on a few occasions in an effort to be amusing, but Mr. Chin could not speak the language well. T. 1270-72. Dr. Chin gave Mr. Chin and his wife substantial financial assistance, including sending a check every month

-19-

during the previous ten years. T. 1263. Additionally, Dr. Chin was well acquainted with Mr.

Chin's signature and identified the signatures on the credit card receipts as that of Mr. Chin. T.

1265. Finally, he had seen his brother every week during 1999, and Mr. Chin never went to

China. T. 1266.

The government called twenty witnesses who claimed to have spoken to the swindler.

Several witnesses testified that they had spoken to the swindler only in Mandarin, and it was

clear that Mandarin was the swindler's native language. T. 82 (Eng), 158 (Li); T.563 (Cai); T.

747 (Lai). Other witnesses testified that although they communicated with the swindler in

Cantonese, he spoke with a Mandarin accent. T. 450 - 451 (Dang); T. 516 (Xian); T. 663

(Zheng); T. 989 (Mei). Winnie Li testified that one of her primary functions as the swindler's

secretary was to function as an interpreter because the swindler spoke Cantonese poorly. T. 158.

None of the government's twenty witnesses testified that the swindler spoke Cantonese as his

native language. Mr. Chin is a native Cantonese speaker.

Doctor Dana Bourgerie, a linguistics professor with extensive experience in both the

Cantonese and Mandarin dialects of Chinese, testified about the pronounced differences in the

respective languages. T. 1279. She spoke with Mr. Chin on numerous occasions over the course

of several months with the purpose of determining whether he could convincingly "fake" a

Mandarin accent. T. 1280-83. Dr. Bourgerie concluded that it was highly unlikely that Mr. Chin

could ever effectively pose as a native Mandarin speaker and even less likely that he could adopt

a Mandarin accent while speaking his native Cantonese. T. 1283. She stated that it would be

very difficult for a native Cantonese speaker to master the continuity of tone, especially over an

extended or unscripted conversation.  T. 1282.[4]

Francis Paulson, head of security at P.C. Richard stores, and Pasquale Conte, owner of several Key Food supermarkets, both testified that the security procedures in their stores required that employees check the purchaser's signature on credit card receipts against those on the cards themselves, and that the customers were then given signed copies of the receipts.  T. 1310-11 (Paulson); T. 1327-29 (Conte).

Roger Rubin, a handwriting expert, examined the signatures on numerous credit card receipts and, after comparing them with known samples, concluded that they were Mr. Chin's signature.  T. 1404-12.  He testified that any effort by another person to imitate Mr. Chin's signature would have resulted in interruptions to the natural flow and pressure levels in the signature, and that those indications were not present.  T. 1411.  On rebuttal, the prosecution presented its own handwriting expert, John Sang, who gave his opinion that some of the signatures were not authentic.  T. 1481-83.

## C.    *The Newly Discovered Evidence*

The newly discovered evidence fatally undermines Mr. Chin's convictions, and establishes his actual innocence in two principal ways: (1) It provides a credible and compelling identification of the real culprit; and (2) it indisputably corroborates Mr. Chin's alibi in respect to his whereabouts during the summer of 1999 – the period the swindler was in China.

---

[4] Cathy Bryant, an INS agent fluent in both Mandarin and Cantonese, worked with Mr. Chin for a few years at JFK airport processing immigrants from China.  T. 1117.  Although she primarily spoke English with Mr. Chin, she had heard him speak Mandarin as well as Cantonese and he had conducted some interviews in Mandarin.  T. 1118, 1121-25.  She acknowledged that the interviews were essentially conducted by reading from a form and that she could tell from Mr. Chin's accent that Mandarin was not his native accent, but that he instead had a Cantonese accent.  T. 1127-30.

Consisting of four (4) sworn affidavits, a business receipt, two pages from a log book, and a report by a handwriting expert, the newly discovered evidence not only creates sufficient reasonable doubt, but also erases any possibility that Mr. Chin is guilty of the crimes for which he stands convicted. The affidavit signed by Chiu Kuen Wong, an acquaintance of Mr. Chin's, details all of the unique characteristics of the man that is likely the real culprit, Frank Kan. (*"Wong Affidavit"*). Frank Kan has several unique characteristics that explain some of the oddities in the government's case and also fill in some of the gaps in evidence. The affidavits signed by Shehan Chin and Joseph Vee, accompanied by a business receipt, demonstrate conclusively that Mr. Chin was in Flushing, New York during July and August, 1999. (*"Chin Affidavit"* and *"Vee Affidavit"*, respectively). Their affidavits and Mr. Chin's alibi are further corroborated by log book entries Mr. Chin made in July 1999. (*"Log Book"*). The handwriting report by Robert Bey, verifies that the log book was indeed written by Mr. Chin. (*"Bey Report"*).

### 1.   *The Affidavit of Chiu Kuen Wong*

In his April 21, 2008, Affidavit attached as Exhibit 2 to this Petition, Chiu Kuen Wong states that he has known a man named Frank Kan for over twenty years. *Wong Affidavit*, ¶ 3. Frank Kan exhibits many of the same unique characteristics as the swindler. Mr. Wong taught Frank Kan the watch repair business, and Frank Kan was known to sell jewelry. *Id*, ¶ 4. Additionally, Frank Kan would hide his hand from people, a trait witnesses attributed to the swindler. *Id*, ¶ 5. Finally, Frank Kan was known to travel to China regularly. *Id*, ¶ 7.

### 2.   *The Affidavit of Joseph Vee*

In his April 20, 2008, Affidavit attached as Exhibit 3, Mr. Vee states that he is the

-22-

manager of New Amber Auto Services, Inc. located in Flushing, Queens. *Vee Affidavit*, ¶ 1. Tin Yat Chin has been a customer of New Amber Auto Services, Inc. for approximately thirty years. *Vee Affidavit*, ¶ 4. Over the past thirty years Mr. Vee has become very familiar with Mr. Chin. *Id.* He recognizes him by name and by appearance. *Id.* Mr. Vee remembers Mr. Chin bringing his car in for service July 30, 1999. *Vee Affidavit*, ¶ 6. Mr. Vee performed service on Mr. Chin's car and then issued him a receipt. *Vee Affidavit*, ¶ 7.

### 3.    *Affidavit of Shehan Chin*

Shehan Chin states in her April 20, 2008, Affidavit attached as Exhibit 4, that she is Mr. Chin's daughter. During the summer of 1999, when the swindler was in China, Mr. Chin was a stay-at-home dad, and was very involved in the daily activities of his daughter. Mr. Chin either drove his daughter to school or picked her up everyday from July 9, 1999, to August 10, 1999. *Chin Affidavit* ¶ 6. Beginning August 11, 1999, and continuing for the next two weeks, Mr. Chin drove his daughter to and from a swimming program at Queens College. *Chin Affidavit* ¶ 8. Shehan Chin saw her father everyday during the summer of 1999. *Chin Affidavit* ¶ 9.

### 4.    *The Log Book of Mr. Chin's Daily Work Activities In July 1999*

In addition to chaperoning his daughter to her school and programs, Mr. Chin was working as a landlord and superintendent for his tenant. Mr. Chin performed various tasks in his tenant's apartment during the summer of 1999. Mr. Chin maintained a log book of all of the repairs and other work that he did in the apartment. The log book details several tasks that Mr. Chin completed during the summer of 1999. Those tasks included repairing a leaking pipe and waxing the floor July 4, 1999; completing the second layer of wax July 5, 1999; negotiating the purchase price for a window shade July 12, 1999; and meeting July 13, 1999 with his tenant

about the planned repairs. *See Log Book* (a copy of which is attached to this Petition as Exhibit 5). The log book is accompanied by a the sworn April 20, 2008, Affidavit of Siu Ngan Cho, attached as Exhibit 6 (*"Cho Affidavit"*).

**ARGUMENT**

**POINT I**

**MR. CHIN IS ENTITLED TO RELIEF
BECAUSE HE IS ACTUALLY INNOCENT
AND THEREFORE HIS CONTINUED
IMPRISONMENT VIOLATES HIS RIGHTS
UNDER THE FIFTH AND EIGHTH AMENDMENTS**

28 U.S.C. § 2255 provides that a defendant in federal custody may seek relief on the grounds that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). The Supreme Court has stated that "the grounds for relief under § 2255 are equivalent to those encompassed by § 2254, the general federal habeas corpus statute" but that in order to warrant relief under 28 U.S.C. § 2255 the errors complained of must amount to a "miscarriage of justice." *Davis v. United States*, 417 U.S. 333, 343-344, 346 (1974), *accord Graziano v. United States*, 83 F.3d 587, 590 (2d Cir.1996).

The Fifth Amendment assures that all convictions must be secured through due process of law and the Eighth Amendment protects against cruel and unusual punishment. *U.S. Const., amend. V and VIII.* In 1970 the Supreme Court made plain that the requirement that every element of a crime be proved beyond a reasonable doubt is a constitutional requirement. *In Re*

-24-

*Winship*, 397 U.S. 358, 364 (1970).  In *Winship* the Court declared " [l]est there remain any doubt about the constitutional stature of the reasonable-doubt standard, we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Id.* Imprisonment of an innocent person violates the Constitution and is a miscarriage of justice.

Here, such a miscarriage of justice occurred and persists as long as Mr. Chin's convictions remain intact and he remains in prison for crimes he did not commit.  The newly discovered evidence proves that Mr. Chin is actually innocent of the charges and that the evidence before the Court cannot possibly prove every element of every offense beyond a reasonable doubt.  This Court must vacate his conviction and sentence, in order to remedy this miscarriage of justice and the violation of Mr. Chin's rights under the Constitution.

A.    ***A Freestanding Claim of Actual Innocence Is Cognizable Pursuant to* Herrera v. Collins**

In *Herrera v. Collins*, 506 U.S. 390, 404-05 (1993), the Court rejected the merits of the petitioner's "freestanding" actual innocence claim, yet assumed that "a truly persuasive demonstration of actual innocence made after trial would render the execution of a defendant unconstitutional" and warrant habeas relief. *Id.* at 417.  Six Justices in *Herrera* went further, asserting the position that truly persuasive "freestanding" innocence claims would clearly be cognizable. *See id.*, 506 U.S. at 419-20 (O'Connor and Kennedy, J.J., concurring); *id.* at 430 (White, J., concurring in the judgment); *id.* at 430-31 (Blackmun, Stevens, and Souter, J.J., dissenting).

The Court has since left open the question of the validity of a freestanding actual

-25-

innocence claim. *See, e.g., House v. Bell*, 547 U.S. 518, 554-5 (2006) ("[Petitioner] urges the Court to answer the question left open in *Herrera* and hold not only that freestanding innocence claims are possible but also that he has established one. We decline to resolve this issue. We conclude here, much as in *Herrera*, that whatever burden a hypothetical freestanding innocence claim would require, this petitioner has not satisfied it").

Lower courts, though, have adopted freestanding claims of innocence as viable claims via habeas corpus. For example, the Ninth Circuit has repeatedly stated that a freestanding claim of actual innocence, similar to the one contemplated in *Herrera*, is a viable ground for habeas corpus relief. *See, e.g. Carriger v. Stewart*, 132 F.3d 463, 476-477 (9th Cir. 1997); *Jackson v. Calderon*, 211 F.3d 1148, 1164-65 (9th Cir. 2000); *Caro v. Calderon*, 162 F.3d 1167, 1170 (9th Cir. 1998).

Recently, the Ninth Circuit reiterated its position, explaining that "[i]n this circuit we not only have assumed freestanding innocence claims are possible but also have articulated a minimum standard: 'a habeas petitioner asserting a freestanding innocence claim must go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent." *Osborne v. District Attorney's Office for the Third Judicial District*, ___ F..3d ___, 2008 WL 861890 (9th Cir. 2008) (quoting *Carriger*, 132 F.3d at 476).

Similarly, the Third Circuit has recognized that *Herrera* implied that a freestanding claim of actual innocence was a cognizable ground for federal habeas corpus relief. *Albrecht v. Horn*, 485 F.3d 103, 122 (3rd Cir. 2007)(denying the claim on the merits). Likewise, the Fourth Circuit, in *Hunt v. McDade*, 205 F.3d 1333, 1335 (4th Cir. 2000), the Eighth Circuit, in *Cornell v. Nix*, 119 F.3d 1329 (8th Cir.1997) and *Griffin v. Delo*, 33 F.3d 895, 908 (8th Cir. 1994), and the

Eleventh Circuit, in *Felker v. Turpin*, 83 F.3d 1303, 1312 (11th Cir. 1996), have all contemplated the viability of a freestanding actual innocence claim based on a violation of Due Process. *But see Wright v. Stegall*, 247 Fed. Appx. 709 (6th Cir. 2007); *Lucas v. Johnson*, 132 F.3d 1069 (5th Cir 1998); and *Pettit v. Addison*, 150 Fed. Appx.923 (10th Cir. 2005).

The Second Circuit has not adopted a definitive position on the matter.[5]  However, several district courts have addressed the question.  In *White v. Keane*, 51 F. Supp.2d 495 (S.D.N.Y. 1999), the District Court dismissed petitioner's habeas petition that challenged, *inter alia*, a claim that the trial court abused its discretion in failing to set aside the jury verdict based on the petitioner's motion based on newly discovered evidence.

In reviewing that claim, the District Court concluded that under a "literal" interpretation of *Herrera*, courts do not possess power to grant habeas relief based on freestanding actual innocence claims, but under a  "more liberal" interpretation, *habeas* relief would lie for an actual innocence claim when newly discovered evidence is "so compelling it would be a violation of fundamental fairness embedded in the Due Process clause not to afford a defendant a new trial at which the evidence could be considered." 51 F. Supp.2d at 495, 502-503, *quoting Coogan v. McCaughtry*, 958 F.2d 793, 801 (7th Cir. 1992) (internal quotation marks omitted).

---

[5] The Second Circuit has not yet evaluated a *Herrera* freestanding actual innocence claim directly.  However the Court has examined claims of actual innocence under the *Schlup v. Delo*, 513 U.S. 298 (1995) paradigm.  *See Lucidore v. New York State Division of Parole*, 209 F.3d 107, 114 (2d Cir 2000) ("[i]n order to demonstrate actual innocence in a so-called collateral proceeding, a petitioner must present 'new reliable evidence that was not presented at trial' and 'show that it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt'" ) (quoting *Schlup*, 513 U.S. at 299);  *Spence v. Great Meadow Correctional Facility*, 219 F.3d 162, 172 (2d Cir. 2000) ("[w]here a petitioner shows by clear and convincing proof that he is actually innocent of the conduct on which his sentence is based, the incarceration is fundamentally unjust and the miscarriage of justice exception to the procedural default bar applies").

More recently, albeit in an unpublished opinion, Judge Brieant expressed his belief that

*Herrera* allows for freestanding actual innocence claims. *Sacco v. Greene*, 2007 WL 432966

(S.D.N.Y. 2007). In *Sacco*, Judge Brieant pointed out that "*Herrera* shows that at least five of

the Justices apparently would in a proper case affirmatively hold that a free standing claim of

innocence may be litigated in a habeas petition. It would seem as a matter of ordinary logic, that

the law must be the same in a capital case as in a case involving significant imprisonment." *Id.*

Similarly, in *Lyon v. Senkowski*, 109 F. Supp.2d 125 (W.D.N.Y. 2000), the Court

considered a 28 U.S.C. § 2254 petition that included a challenge to the denial of a post-trial

motion for DNA testing (DNA testing had not been available at the time of the 1982 trial). In

considering the DNA claim, the Court characterized *Herrera* as leaving open the question of

freestanding actual innocence claims: "Herrera did not rule on whether 'freestanding' claims of

innocence could ever be a basis for habeas relief. However, it noted that 'the threshold showing

for such an assumed right would necessarily be extraordinarily high.'" *Lyon*, 109 F. Supp.2d at

142 (*quoting Herrera*, 506 U.S. at 417).

Thus, while the Court in *Lyon* ultimately rejected the petitioner's claim after concluding

that DNA evidence could not undermine petitioner's burglary conviction, the predicate for his

felony murder conviction, the Court did recognize the potential viability of a freestanding claim

of innocence.

A District Court in the Eastern District of Michigan has also found freestanding claims of

actual innocence to be cognizable grounds for federal habeas relief. *Jackson v. Straub*, 309 F.

Supp.2d 952, 959 (E.D.Mich. 2004). In *Jackson*, the Court noted "[t]hat [because] the Supreme

Court has held that a free-standing claim of innocence in a non-capital case based on newly-

discovered evidence lacks merit as a purported due process violation does not suggest that the

district courts may not adjudicate such a claim in precisely that manner and deny it."[6]

Thus, a freestanding claim of actual innocence is a cognizable claim under *Herrera*, and

this Court should evaluate Mr. Chin's claim of actual innocence on its merit. The newly

discovered evidence coupled with the problematic identifications and the contradictory evidence

in the first trial demonstrates that Mr. Chin is actually innocent and this Court should vacate his

conviction and sentence.

**B.      *Mr. Chin is Actually Innocent and Therefore
          His Conviction and Sentence Should Be Vacated***

This Court should apply the standard set forth by the Ninth Circuit in *Carriger* – that Mr.

Chin's actual innocence claim is cognizable – and proceed to evaluate the evidence to determine

if Mr. Chin has demonstrated that he is probably innocent. *Carriger*, 132 F.3d at 476. In

evaluating the evidence and determining if Mr. Chin has demonstrated that he is probably

innocent, "the District Court must assess the probative force of the newly presented evidence in

---

[6] A state appellate court has opined that freestanding claims of innocence should be actionable
via habeas corpus. For instance, in *People v. Washington*, the Illinois Supreme Court analyzed
*Herrera* and, although believing that *Herrera* ultimately held that freestanding claims of actual
innocence are not cognizable federal habeas claims, disagreed with *Herrera*'s reasoning. Thus,
in *Washington*, the Court stated that "[w]e think that the Court overlooked that a 'truly
persuasive demonstration of innocence' would, in hindsight, undermine the legal construct
precluding a substantive due process analysis. The stronger the claim – the more likely it is that a
convicted person is actually innocent – the weaker is the legal construct dictating that the person
be viewed as guilty. A 'truly persuasive demonstration of innocence' would effectively reduce
the idea to legal fiction." *People v. Washington*, 171 Ill.2d 475, 488 (1996). The Court in
*Washington* continued, "[w]e believe that no person convicted of a crime should be deprived of
life or liberty given compelling evidence of actual innocence. ... Given the limited avenues that
our legislature has so far seen fit to provide for raising freestanding claims of innocence, that idea
– but for the possibility of executive clemency – would go ignored in cases like this one." *Id.* at
489 (internal citations omitted).

connection with the evidence of guilt adduced at trial. Obviously, the Court is not required to test the new evidence by a standard appropriate for deciding a motion for summary judgment." *Schlup v. Delo*, 513 U.S. 298, 331 (1995).

Here, the newly discovered evidence offers credible, corroborated proof, that Mr. Chin was in Flushing, New York during July and August 1999. The undisputed evidence at trial established that the swindler was in China during this period, therefore the newly discovered evidence establishes conclusively that Mr. Chin was misidentified as the swindler. The evidence of guilt adduced at trial was anything but overwhelming. The identification testimony adduced at trial was tainted and unreliable. Furthermore, as discussed *supra*, the evidence pertaining o the circumstances of the fraud was contradictory, inconsistent, and not wholly credible.

### 1.   *The Law Relevant to "Newly Discovered Evidence"*

As the Second Circuit has explained, "'new evidence' in 2255 proceedings, as in Fed.R.Crim.P. 33 determinations, is evidence that is discovered after the original hearing, and which could not, with due diligence of counsel, have been discovered sooner." *Giacalone v. United States*, 739 F.2d 40, 43 (2d Cir. 1984) (*citing United States v. Dukes*, 727 F.2d 34, 38 (2nd Cir.1984); *United States v. Natelli*, 553 F.2d 5, 7 (2d Cir. 1977); *United States v. Stofsky*, 527 F.2d 237, 244 (2d Cir.1975); *cf.* 28 U.S.C. §2244(c) (same with regard to evidence newly discovered after Supreme Court review of state conviction)).

### 2.   *The Identification Evidence at Trial Was Tainted and Unreliable*

The evidence at trial left significant room to doubt whether or not Mr. Chin was properly identified as the perpetrator of the fraud. The government did not recover any of the proceeds of the fraud, none of the many documents produced at trial had Mr. Chin's fingerprints on them,

and perhaps most importantly, all of the witnesses testified that the swindler was a native Mandarin speaker while Mr. Chin is a native Cantonese speaker. The strongest evidence that the government could conjure that Mr. Chin was the perpetrator of the fraud was merely the sheer number of people that testified. However, the majority of the identifications were tainted and unreliable.

Mr. Chin has always maintained that he was misidentified. The government relied on the quantity of witnesses rather than the quality of the identifications to convict Mr. Chin. If the tainted and unreliable identifications are discounted the bottom falls out of the government's case. When this Court views the evidence adduced at trial in combination with the probative value of the newly discovered evidence, it must consider the weight to give to the in court identifications. *Schlup,* 513 U.S. at 331. The identifications here were severely tainted by their surrounding circumstances, thus rendering them incredible and not conclusive proof of Mr. Chin's guilt.

The Supreme Court established the standards for the admissibility of photographic identifications in *Simmons v. United States,* 390 U.S. 377, 383-84 (1972) and *Neil v. Biggers,* 409 U.S. 188, 199 (1972). The Supreme Court has stated that identification testimony obtained by unduly suggestive procedures violates a defendant's right to due process because it may lead to an irreparably mistaken identification. *Stovall v. Denno*, 388 U.S. 293, 301-01 (1967); and *Biggers*, 409 U.S. at 196.

Moreover, a suggestive pre-trial identification may so taint subsequent out-of-court and in-court identifications that an accused is denied due process of law if the witness is permitted to make the in-court identification. *See United States v. Maldonado-Rivera*, 922 F.2d 934, 973 (2d

-31-

Cir. 1990). Once a procedure is established as impermissibly suggestive, the reliability of the subsequent in-court identification of evidence must be analyzed by weighing the indicia of reliability against the indicia of improper influence. *Id.*

The Supreme Court has recognized that even when the photo array is not unduly suggestive on its face the "improper employment of photographs may sometimes cause witnesses to err in identifying criminals." *Simmons v. United States*, 390 U.S. 377, 383 (1968). Thus, as the Second Circuit has instructed, "[a]n otherwise fair pretrial identification procedure may be rendered impermissibly suggestive through subsequent actions or remarks by government agents." *United States v. Thai*, 29 F.3d 785, 810 (2d Cir. 1994) (citation omitted). In *Thai*, for example, one witness was complimented by officers on a job well done. *Id.* at 810-11. Such tactics may tend to reinforce an otherwise weak or tentative identification and therefore lend a later in-court identification greater conviction than it deserves. *Id.* at 810 (*citing United States v. Leonardi*, 623 F.2d 746, 755 (2d Cir. 1980)).

Similarly, in *United States v. Saunders*, 501 F.3d 384 (4th Cir. 2007), the Fourth Circuit was confronted with a photographic array that was itself suggestive, and the police officers' failure to advise the witness, as required by internal procedures, "that the array may not contain a photo of the person under investigation." *Id.* at 388. The police had told the witness "that they had arrested one or more suspects in the robbery." *Id.* at 391.

The Court in *Saunders* recognized that this information could taint the identification process. Imparting this information to the witness *can lead him to assume* that a photo of the arrested person will be in the array. The witness, moreover, can feel pressure to make an identification, even if he is not fully confident, for fear of jeopardizing the case against the

-32-

arrested suspect. *Id.* (emphasis added). Thus, the possibility of an assumption by the witness was the danger identified in *Saunders*.

The government called twelve witnesses to identify Mok Wah. Yet none of the witnesses provided a positive and untainted identification. As detailed *ante*, at 7-10, even the government's witnesses that had substantial contact with Mok Wah were unable to make positive reliable identifications. Mr. Wong, who had rented an apartment to Mok Wah and met with him once a month while he was his tenant, could not identify him in the photo array. Indeed, during the 2003 trial Mr. Wong actually got out of his seat and walked around the courtroom until he was satisfied that Mok Wah was not present. T. 684-693.

Another government witness, Ah Ci, who worked closely with Mok Wah for a year including traveling to China for their business, walked around the courtroom in the 2003 trial and *then identified United States Marshal Joseph Wong as Mok Wah.* T. 880-882. Ah Lai worked as Mok Wah's secretary for several months, yet when she viewed the photo array the most she could say about the photo of Mr. Chin is that "my former employer looks like the person in the photo but I am not sure." *Witness Identification Response*, Exhibit 1. Similarly, Yi Zheng Chen had close and repeated contacts with Mok Wah, but when Mr. Chen viewed the photo array he informed the agents that he did not recognize any of the photos. T. 809.

The witnesses who had less opportunity to see Mok Wah were all aided by government agents or their relatives, thus tainting their eventual identifications. Jia Sheng Tan was directed by the agents to "recognize Mok Wah" – conduct significantly more harmful and prejudicial than the error complained of in both *Thai* and *Saunders*. *Thai*, 29 F.3d at 810; *Saunders*, 501 F.3d at 388. Jia Sheng Tan was unable to identify Mok Wah in the 2003 trial. T. 906-907. Situ was

-33-

told that agents were coming to talk to her about Mok Wah, and that she had to identify his

picture, yet it still took her five minutes before she settled on a photograph that looked like Mok

Wah. (T 781).

The government also called four witnesses who had not seen Mok Wah since 1998, but

who had identified a photo for the first time in February 2005. T. 932-1006.  As discussed *ante*,

at 10,  however, those identifications were irreparably compromised because by February 2005,

there had been significant media coverage of the case, and some of the articles had included

photographs of Mr. Chin identifying him as the swindler.  Yong Ai Zhou testified that she went

to the authorities in February 2005, only after, and because, she saw in the newspaper Mr. Chin's

photo accompanying an article stating he had been charged as Mok Wah, and that victims of his

swindle were testifying against him.  T. 958-59.

The Tan C. Dau identifications fare no better.  Although the government called another

dozen witnesses to identify Mr. Chin as Tan C. Dau, these identifications were scarcely better

than the Mok Wah identifications.  Yee Wan Chan showed the perpetrator the apartment that he

rented as an office at 7709 4th Ave. T. 1343.  Additionally, she lived in the building and thus had

many opportunities to see the perpetrator.  T. 1341.  However, after this prolonged opportunity to

see him, Yee Wan Chan did not identify Mr. Chin as the perpetrator in the photo array or in

court.

Winnie Li worked with Tan C. Dao as his secretary for almost a year. T. 158.  After

working directly for him on a daily basis for months, Winnie informed the agents on November

20, 2001 that number five (Mr. Chin) in the photo array "looked like" Mr. Tan. T. 168-9.  She

was not certain.  Jin Quan Xian testified that had seen two articles about the swindle containing

-34-

two photos of Mr. Chin, and then only afterward contacted the agents. T. 521, 525. When Mr.

Xian met with agents he identified the photo of the man he had just seen in the newspaper. Jane

Xie contacted Agent Chiu because she read an article in the newspaper and had seen Mr. Chin

pictured as the swindler. T. 620.

Law enforcement agents further degraded the reliability of the identification by showing

Mrs. Xie the photo array and asking her, "Which of these pictures is the man who swindled

you?" 2003 Trial T. 972. Similarly Li Zhen Zheng was informed that Tan C. Dau was in the

photo array and she needed to pick him out. T. 664. Other government witnesses identified Mr.

Chin years after a very brief single encounter with him. Only Mrs. Huang and Mrs. Dang had

extended contacts with Tan C. Dau and then identified Mr. Chin as Tan C. Dau.

However, given their patent and self-serving bias, their credibility is dubious. As

discussed *ante*, at 13-14, Mrs. Huang and Mrs. Dang were both intimately involved in the

scheme to defraud, and were personally responsible for the recruitment of victims. Additionally,

Mrs. Dang was responsible for choosing Mr. Chin as the scapegoat: it was she who brought his

photo to the agents and spun her wholly contrived tale of woe.

The defense case cast serious doubt on the identifications. The language issue simply

cannot be ignored. Doctor Dana Bourgerie, a linguistics professor with extensive experience in

both the Cantonese and Mandarin languages, testified about the pronounced differences between

the two. T. 1279. Describing the difference between Cantonese and Mandarin, Dr. Bourgerie

stated that "we will see them as being different, at least as Romanian and Spanish. They're both

the same family of language but you only pick up pieces of it, and you don't get that wide of

understanding." T. 1279.

After speaking with Mr. Chin over a period of several months, Dr. Bourgerie concluded that it was highly unlikely that he could ever effectively pose as a native Mandarin speaker and even less likely that he could adopt a Mandarin accent while speaking his native Cantonese.  T. 1283.  Of the twenty government witnesses that had spoken to the swindler, no one testified that he was a Cantonese speaker.  However, several witnesses testified that they had only ever spoken to the swindler in Mandarin and it was clear that Mandarin was his native language.  T. 81-82 (Eng); T. 158 (Li), T. 563 (Cai), T. 747 (Lai).

While still others testified that, although they communicated with the swindler in Cantonese, he spoke with a Mandarin accent.  T. 450 - 451 (Dang); T. 516 (Xian); T. 663 (Zheng); T. 934 (Situ); T. 989 (Mei).  Winnie Li testified that one of her primary functions as the swindler's secretary was to function as an interpreter because the swindler spoke Cantonese poorly.  T. 158.

Undisputed evidence presented by the government showed that the swindler was in China during the summer of 1999.  Three witnesses testified in Mr. Chin's defense that he was in Queens during the summer of 1999 and had not left for any significant period of time.  In the summer of 1999, Lorna Drew-Monteroso and Mr. Chin had a car-pool arrangement for their children and she saw Mr. Chin almost every weekday of that summer.  T. 1190-91.  Sui Ngan Cho, Mr. Chin's wife, testified that she saw her husband daily during the summer of 1999.  T. 1213-15.  Finally, Mr. Chin's brother, Dr. Tin S. Chin, testified that he had seen his brother every week during 1999, and Mr. Chin never went to China.  T. 1266.

**2.    *The Evidence at Trial Was Inconsistent and Contradictory***

In addition to the inaccurate, biased, and unreliable identifications, the government

-36-

witnesses offered inconsistent and contradictory testimony that further served to diminish their

credibility. For example, Ah Ci portrayed herself as an innocent dupe who thought that Mok

Wah was a legitimate attorney.   However, Ah Ci forged records in bank books, with Mok Wah's

assistance, and then returned them to people to use in passport applications. T. 832.

Additionally, Ah Ci tried to explain her mistaken identity of the United States Marshal in the

2003 trial by claiming that she had very little contact with Mok Wah. T. 887.  However, she

retained receipts from Mok Wah from April 12 and 25, 1997; May 13 and 27, 1997; August 17,

1997; September 3 and 8, 1997; and  November 2, 9, and 10, 1997.  T. 888.  Moreover, Ah Ci

was so close to Mok Wah that she once lent him $10,000.00 for no other reason than that Mok

Wah called and asked her for money. T. 834.  Further demonstrating Ah Ci's glaring lack of

credibility, she originally claimed that she had lent Mok Wah $100,000.00 because she wanted to

get more money to pay her debts.  T. 835.

      The timing of certain events critical to the government's theory is also irreconcilable with

the evidence, and is fatally undermined by the newly discovered evidence.  For example, Ah Ci

traveled to China to further her business with Mok Wah, returning February 22, 1998.  T. 844.

Ah Ci claimed that she and Ah Lai attempted to contact Mok Wah after February 22, 1998, but

were unsuccessful. T. 855.  However, Ah Lai testified that she stopped working for Mok Wah in

April 1998.  T. 736.  Dissatisfied with that answer, the government pressed Ah Lai to agree that

it was February or March, 1998, but Ah Lai would agree only that it was "early" 1998.  T. 736.

Regardless, Ah Lai also testified that she was in contact with Mok Wah for a "few weeks" after

she stopped working for him, and met him again in Chinatown. T. 736-37.  Despite claiming

that she stopped working from him a few weeks prior, Ah Lai still agreed to collect $10,000.00

from Situ and lie to her about Mok Wah's whereabouts.  T. 737-38.

Contradicting Ah Lai's testimony that she collected $10,000.00 from Situ in early 1998, Situ stated that her last payment was for $3,140.00.  T. 774.  After making the $3,140.00 payment, Situ was told by her sister-in-law's husband that Mok Wah had run away.  T. 774-75. Prior to that Situ had paid only $550.00 to Mok Wah.  T. 772.  Similarly, Li Zhen Zeng testified that she paid Mr. Tan $12,200 on February 18, 1999, and that she never saw him again after that. T. 659-60.  During the 2003 trial Mrs. Zeng testified that after Mok Wah disappeared in February, 1999 she contacted Mrs. Xie trying to locate him, but was unsuccessful.  2003 Trial T. 1059 - 1060.  However, Mrs. Xie testified that she collected more money for Mr. Tan after he returned from China in February 1999.  T. 597-598.  Furthermore, Mrs. Xie continued to collect money from other recruits and turn it over to Mr. Tan as late as June 27, 1999.  T. 601.

The above examples are by no means the only instances of the witnesses' inconsistent statements and contradictory claims.  These examples, and the many more that can be found in the record, demonstrate that the government's case was far from compelling.  Coupled with the tainted and unreliable identifications these contradictions demonstrate that Mr. Chin is probably innocent of the charges and this Court should vacate his conviction and sentence.  *Carriger*, 132 F.3d at 476.  In determining if Mr. Chin has demonstrated that he is "actually innocent" this Court must examine the weight of the evidence of guilt adduced at trial.  *Schlup* 513 U.S. at 331.

As discussed, the evidence of guilt adduced at trial was tainted, unreliable, and inconsistent, therefore this court should give it very little weight.  Many of the identifications were of such a biased and tainted nature that the trial court would have acted properly to preclude many of them.  *Simmons*, 390 U.S. 377.  Moreover, in a case based entirely on the credibility of

the witnesses – there was no physical evidence tying Mr. Chin to the fraud – the fact that the

witnesses degraded their credibility by contradicting each other and making inconsistent

statements, must be considered by this Court. The newly discovered evidence, evidence that

establishes Mr. Chin's whereabouts, is highly probative and demonstrates Mr. Chin's actual

innocence.

3. ***The Newly Discovered Evidence Demonstrates***
***That Mr. Chin Is Probably Innocent of the Charges***

Mr. Chin has always maintained that he was misidentified as the perpetrator of the fraud.

The newly discovered evidence at the very least creates an articulable reasonable doubt that

Frank Kan, and not Mr. Chin, was, in fact, the swindler. As the newly discovered evidence

establishes, Frank Kan and Mr. Chin both served in the Auxiliary Police Unite of the 5th Precinct

in Chinatown in the 1980's. *Wong Affidavit,* ¶ 3 and 4.

Also, several witnesses testified that the perpetrator sold jewelry as a side business. T.

65-66 (Eng); T. 168 (Dang); T. 733 (Ah Lai); T. 795 (Y. Chen); T. 839 (Chen). Mr. Chin has

never sold jewelry. However, Frank Kan was introduced to the watch and jewelry business in the

1980's and continued to sell jewelry through the 1990's. *Wong Affidavit,* ¶ 5.

In addition, multiple witnesses testified that the perpetrator held papers between his

knuckles, curling his fingers away from them, as if there was something wrong with his hand. T.

67 (Eng); T. 140-141 (Li); T. 362 (Dang). The government tried to fit this dissonant testimony

into its theory that Mr. Chin was the perpetrator by arguing that he did this to keep his

fingerprints off the documents. T. 1440. However, a simpler and more likely (and more

credible) explanation is that the perpetrator actually had something wrong with his hand. In this

context, it is most noteworthy that Frank Kan is missing a portion of his index finger and curls his hand away from people in order to hide the finger. *Wong Affidavit,* ¶ 6. Mr. Chin has all ten fingers and they function properly. Moreover, the fingerprint examiner was able to discern a usable fingerprint from one of the documents, and the fingerprint did not belong to Mr. Chin. T. 1366.

Moreover, perhaps most importantly, Frank Kan, unlike Mr. Chin, is known to have traveled to China on several occasions during the period in question. *Wong Affidavit,* ¶ 7. The swindler spent the summer of 1999 in China, where he met with Winnie Li, Mrs. Dang and others. Conversely, and dispositively, the newly discovered evidence confirms in multiple ways that *Mr. Chin was in Queens during the summer of 1999.*

Shehan Chin attests in her affidavit that Mr. Chin, her father, drove her to or from school from July 7, 1999, until August 10, 1999. *Chin Affidavit,* ¶ 6. Additionally, for two weeks following August 10, 1999, Mr. Chin drove her to and from a swimming program at Queens College. *Chin Affidavit,* ¶ 8.

Also, the log book from Mr. Chin's work as a landlord/superintendent details his daily activities during July 1999. *Log Book,* Exhibit 5.[7] At trial, Sui Ngan Cho testified that she and

---

[7] The log book entries are admissible as business records, Fed.R.Evid. 803(6), which exempts from the definition of hearsay:

> A memorandum, report, record, or data compilation, in any form, of acts, events conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation...The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

Mr. Chin derived a portion of their income through a rental property. (T 1206). Mr. Chin was responsible for maintenance of their home and the rental property. (T 1212). As part of the normal course of business the Chin's maintained a log book of all activities pertaining to the rental property. *Cho Affidavit*, ¶ 3. The log book was maintained in the regular course of business and entries were made at the time that the service was performed. *Cho Affidavit*, ¶ 3. As the superintendent, Mr. Chin was responsible for filling out the log book whenever he performed any service for the rental property. *Cho Affidavit*, ¶ 7.[8]

Winnie Li testified that at the behest of Mr. Tan, she collected $1,000.00 from Mrs. Dang at the Lau Fa Hostel in Guangzhou, China on July 11, 1999. T. 127. She then delivered that money to Mr. Tan July 12, 1999, at the Dong Fong Hotel in Guangzhou, China. T. 128. The government contends that Mr. Chin was in China on these dates, and that he took the money from Winnie Li. The log book, however, indicates that Mr. Chin was applying the second layer of wax to the floor of his rental property July 11, 1999. *Log Book.* On July 12, 1999 Mr. Chin was negotiating the price for a shade to be installed in the rental property. *Log Book*, Exhibit 5.

Thus, *Mr. Chin was not in China* during the critical period the swindler was there (although Frank Kan was there), directly disproving an indispensable facet of the government's case. Additional newly discovered evidence fully and convincingly corroborates that conclusion.

---

[8] "[T]he foundation for [business records] receipt can be made by a witness who is not an employee of the preparer. Nevertheless, the 'with knowledge' requirement of Rule 803(6) dictates that 'the court must be able to determine from some appropriate source-from the document itself, or from external evidence (either direct or circumstantial or both), or from some combination of these things-that the foundational element has been met.'" *Ortho Pharmaceutical Corporation v. Cosprophar, Inc.*, 828 F. Supp. 1114, 1119 (S.D.N.Y. 1993) (quoting Saks Int'l,Inc. v. M/V Export Champion, 817 F.2d 1011, 1013 (2d Cir. 1987), and *White Indus., Inc. v. Cessna Aircraft Co.*, 611 F. Supp. 1049, 1060 (W.D.Mo. 1985).

For example, Winnie Li testified that the last time she saw Mr. Tan in China was July 31, 1999, in Shanghai.  T. 135.  The affidavit from Mr. Vee and the receipts from New Amber Auto Services, Inc. prove that July 30, 1999, *Mr. Chin was in Flushing, New York, having service done on his car. See Vee Affidavit, ¶ 6, and Receipt 76557*, attached as Exhibit 7.  Given the twelve hour time difference and the flight time,  it is impossible that Mr. Chin could have been in Flushing, New York on July 30, 1999, and in Shanghai, China on July 31, 1999.

The newly discovered evidence coupled with the dearth of untainted reliable evidence presented by the government demonstrates that Mr. Tan is probably innocent.  The credibility of the witnesses at trial is seriously questioned by the evidence of their biased, inconsistent and contradictory statements.  While on the other hand the newly discovered evidence is corroborated by business records, and is credible conclusive proof of Mr. Chin's defense – that he was in Queens when the swindler was in China.  If this Court compares the credible newly discovered evidence and the evidence presented on the defense case – namely the credit card receipts and evidence that Mr. Chin does not speak the same language as the swindler – with the tainted, inconsistent, and unreliable evidence presented by the government, the only conclusion that can be drawn is that Mr. Chin is innocent.  As such his continued imprisonment is a miscarriage of justice and his conviction and sentence must be vacated.  *Carriger,* 132 F.3d at 476.

## POINT II

## MR. CHIN IS ENTITLED TO RELIEF BECAUSE
## HE WAS DENIED EFFECTIVE ASSISTANCE OF
## COUNSEL IN VIOLATION OF THE SIXTH AMENDMENT

Upon information and belief, Mr. Chin's trial counsel failed to interview Chiu Wong,

Shehan Chin, and Joseph Vee.  Additionally, upon information and belief, trial counsel failed to

investigate possible sources of corroboration of Mr. Chin's alibi.  For instance, no school records

were produced and the log book from Mr. Chin's business was not obtained.  These basic failures

mean that Mr. Chin's right to the effective assistance of counsel, enshrined in the Constitution,

was violated. *U.S. Const. amends. VI.*  Mr. Chin's attorney failed to be effective and afford him

meaningful representation under the standards set forth by the Supreme Court.  *Strickland v.*

*Washington*, 466 U.S. 668 (1984).  As a result, Mr. Chin's conviction and sentence must be

vacated.

In *Strickland* – itself a case addressing counsel's failure to investigate – the Supreme

Court set forth a two-part test for establishing ineffective assistance of counsel, holding that a

defendant must show both that counsel was deficient and that counsel's deficient performance

prejudiced the defense. *Id* at 687.  Both prongs of the *Strickland* test are clearly satisfied in Mr.

Chin's case.  Defense counsel's failure to contact and interview Shehan Chin, Nicholas

Monteroso, and Mr. Vee falls below the conduct reasonably expected of a trial attorney

conducting pretrial investigation. If any of these three witnesses testified at trial, there is a high

likelihood that the jury would have come to a different verdict than it did.

Mr. Chin's attorney fell short of the requirements set forth in *Strickland* by failing to

perform adequate investigation into Mr. Chin's claims that he was not in China during the

-43-

months of July and August 1999.  Proper investigation of Mr. Chin's alibi would have led defense attorney to contact and interview Mr. Wong, Shehan Chin, and Mr Vee – all of whom are friends or relatives of Mr. Chin and easy to locate.  The Supreme Court wrote in *Strickland* that defense counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691.  Mr. Chin's defense counsel failed in this duty.

The failure to investigate the underlying facts of a case is one of the most common grounds for finding that counsel's representation fell below the *Strickland* standard. *See, e.g., Williams v. Taylor*, 529 U.S. 362 (2000) (defendant was denied effective assistance of counsel when counsel failed to investigate and discover mitigation evidence that would have supported a different outcome); *Lindstadt v. Keane*, 239 F.3d 191, 203 (2d Cir. 2001) (counsel's failure to investigate and discover readily available and powerful impeachment material constitutes ineffective assistance); *Brown v. Myers*, 137 F.3d 1154, 1156-57 (9th Cir.1998) (taking it as given that a failure adequately to investigate alibi claim or witnesses constitutes ineffective counsel); *Bryant v. Scott*, 28 F.3d 1411, 1418 (5th Cir.1994) (holding that a failure adequately to investigate alibi witnesses constitutes ineffective counsel); *Lawrence v. Armontrout*, 900 F.2d 127, 130 (8th Cir. 1990) (same); *Nealy v. Cabana*, 764 F.2d 1173, 1177-78 (5th Cir.1985) (same). *See also Williams v. Washington*, 59 F.3d 673, 680-81 (7th Cir. 1995) (ineffective assistance in part for failure to investigate crime scene); *Thomas v. Kuhlman*, 255 F.Supp.2d 99, 110 (E.D.N.Y. 2003) (same).

In *Riley v. Payne*, the court found that an attorney's performance was constitutionally ineffective when the attorney made a decision not to call a witness whom he had reason to

believe could have offered exculpatory testimony for his client, without interviewing that witness first. 352 F.3d 1313 (9th Cir. 2003). The Court wrote that "[h]aving never spoken with [the witness], [defense counsel] could not have fully assessed [the witness's] version of the events, [the witness's] credibility and demeanor, or any other aspect of his involvement that might have reinforced [the client's] defense." *Id.* at 1318-19. The Court concluded that, absent an interview with the potential witness, the attorney could not have reasonably determined if the witness would have been credible or should have been called to testify at trial. *Id.* at 1319. *See also United States v. Gray*, 878 F.2d 702, 712 (3d Cir. 1989) (Lawyer has a duty to "investigate what information . . . potential eye-witnesses possess[ ], even if he later decides not to put them on the stand.") (brackets in original).

Without interviewing Mr. Wong, Shehan Chin, or Mr. Vee defense counsel had no way of knowing if they were credible witnesses willing to swear to facts that corroborated Mr. Chin's defense of misidentification. Additionally, defense counsel's failure to investigate prevented him from presenting credible evidence, in the form of business records – receipt and the log book – that would have conclusively demonstrated Mr. Chin's whereabouts in July 1999. The failure of defense counsel to corroborate Mr. Chin's alibi effectively was particularly prejudicial here given the procedural history of this case. The dates and times that the government alleged that Mr. Chin was in China were pivotal in the trial (as they were in the first trial, as well). Moreover, the first conviction was reversed on appeal for the very reason that the defense was not permitted to enter credit card receipts detailing Mr. Chin's purchases in Queens during the disputed time period. *United States v. Chin*, 371 F.3d 31 (2d Cir. 2004).

Defense counsel's failure to contact the witnesses also lacked any strategic underpinning.

-45-

*See Gray*, 878 F.2d at 711 ("ineffectiveness is generally clear in the context of complete failure to investigate because counsel can hardly be said to have made a strategic choice when s/he has not yet obtained the facts on which such a decision could be made."). The Second Circuit has found a defense attorney's performance ineffective when his decision not to put a witness on the stand was based on inadequate investigation of that witness's putative testimony. *Pavel v. Hollins*, 261 F.3d 210 (2d Cir. 2001). In *Pavel*, defense counsel had been informed by his client that a potential witness could provide testimony tending to substantiate defendant's claims of innocence, but defense counsel never followed up with the witness because, according to the court, defense counsel was mainly interested in "avoiding work – not, as it should have been, serving Pavel's interests by providing him with reasonably effective representation." *Id.* at 218.

Given the centrality and importance of Mr. Chin's alibi, there can be no strategic explanation for the failure to investigate. Defense counsel failed to elicit any new evidence, but rather relied on the same strategy and evidence – with the addition of the previously excluded credit card receipts – that had failed two years prior.

In order to satisfy the prejudice requirement under *Strickland*, a claimant must show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A "reasonable probability" in this context is one that "undermines confidence in the outcome." *Id.* In Mr. Chin's case, testimony from additional witnesses that Mr. Chin was in New York in July and August 1999, and that an acquaintance of Mr. Chin's fit all of the witnesses descriptions, would have created substantial doubt about the prosecution's version of the case in the minds of the jury – particularly when the central task faced by the jury was to assess whether the witnesses might

-46-

have been mistaken about the identification of Mr. Chin as the swindler.

There is more than a reasonable probability that, had defense counsel interviewed Mr. Wong, Shehan Chin, and Mr. Vee, and learned exactly what they were willing to testify to at trial, the outcome in Mr. Chin's case would have been different.  This is particularly true regarding Mr. Vee, who remembers seeing Mr. Chin July 30, 1999, at New Amber Auto Services, Inc.  *Vee Affidavit, ¶ 6.*  His memory is corroborated by receipts that were issued to Mr. Chin.  *Vee Affidavit, ¶ 7-8.*  Such testimony would have been invaluable to Mr. Chin.

The failure to locate and introduce the log book at trial was similarly prejudicial to Mr. Chin.  The log book details Mr. Chin's activities throughout the month of July.  Without this physical record, Mr. Chin's alibi – that he was a stay-at-home father responsible for his home and maintenance of his rental property – was established only through the testimony of his wife.  Defense counsel was aware of the weaknesses of her testimony because she had been subjected to a withering cross-examination in the 2003 trial.  At the 2003 trial the government portrayed her as a dishonest woman that was all too happy to lie to obtain a benefit.  (2003 trial T 1436-1463).  The government referenced multiple forms on which Mr. Chin's wife had lied about her income to receive more credit.  (2003 Trial T 1444-1454).  In the second trial, defense counsel chose to attempt to explain her dishonesty as exaggeration.  (T 1212-1213).  The existence of other credible witnesses and physical evidence detailing Mr. Chin's activities would have blunted the impact of the cross-examination of Mrs. Chin.

Accordingly, Mr. Chin was undoubtedly prejudiced by defense counsel's errors, and but for those errors the outcome would likely have been different.  The two-prong test for ineffective assistance of counsel is established in this case, and it is therefore respectfully submitted that Mr.

-47-

Chin's conviction and sentence must be vacated. *Strickland*, 466 U.S. at 694.

## Conclusion

For all the reasons set forth above, it is respectfully submitted that the Court should vacate Mr. Chin's conviction and sentence.

Dated: April 28, 2008
      New York, New York

Respectfully submitted,

JOSHUA L. DRATEL
JOSHUA L. DRATEL, P.C.
2 Wall Street, 3rd Floor
New York, New York 10005
(212) 732-0707

*Attorneys for Defendant-Movant*
*Tin Yat Chin*

– Of Counsel –

Alice L. Fontier