UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------
x
TIN YAT CHIN,

                   Petitioner,

     -against-

UNITED STATES OF AMERICA,

                   Respondent.
---------------------------------------------------------
x

**MEMORANDUM AND ORDER**

Case No. 08-CV-1735 (FB)

*Appearances:*
*For the Petitioner:*
JOSHUA L. DRATEL, ESQ.
2 Wall Street, 3rd Floor
New York , NY 10005

*For the Respondent:*
BENTON J. CAMPBELL, ESQ.
United States Attorney
Eastern District of New York
By:   ALI KAZEMI, ESQ.
        Assistant United States Attorney
271 Cadman Plaza East
Brooklyn, NY 11201

**BLOCK, Senior District Judge:**

         Tin Yat Chin ("Chin") moves, pursuant to 28 U.S.C. § 2255, to vacate the judgment

of conviction and sentence entered by the Court on February 16, 2006.[1]  He argues that evidence not

presented at trial establishes (1) that he is actually innocent of the crimes of conviction and (2) that

his trial counsel was ineffective in failing to discover and present the evidence.  Chin also moves

to amend his § 2255 motion to include a claim that his Fifth Amendment rights were violated by the

government's delay in indicting him.  For the reasons that follow, both motions are denied.

---

[1]Although Chin is designated as a "petitioner" in the caption, relief is sought under § 2255 by motion.  *See* 28 U.S.C. § 2255(a) ("A prisoner in custody under sentence of a [federal] court . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence.").  The Court follows the statute's parlance.

**I**

On March 10, 2005, Chin was found guilty on one count of impersonating a federal employee in violation of 18 U.S.C. § 912, and three counts of income tax evasion in violation of 26 U.S.C. § 7201.[2]  He was sentenced to 135 months' incarceration, to be followed by three years of supervised release, and ordered to pay restitution of $989,567.  The Second Circuit affirmed on January 30, 2007, *see United States v. Chin*, 476 F.3d 144 (2d Cir. 2007); Chin did not seek review in the United States Supreme Court.  He timely filed his § 2255 motion on April 29, 2008.

**A. Trial Evidence**

The jury was presented with overwhelming evidence that Chin, using the aliases "Mok Wah" and "Tan C. Dau," extracted large fees from Chinese nationals in New York City and China between 1997 and 1999 on the false promise that he could obtain United States visas for their relatives living in China; at various times, Chin posed as an agent of the Immigration and Naturalization Service, an immigration attorney, and a former Chinese consulate employee.  Defense counsel sought to cast doubt on the reliability of the government's identification testimony.  In addition, Chin presented alibi evidence that conflicted with the government's evidence regarding his whereabouts in July 1999.

*1. The Government's Case-In-Chief*

At trial, no less than 8 victims of "Mok Wah" and 6 victims of "Tan C. Dau" identified Chin as the person who had swindled them; the landlords and secretaries of "Mok Wah" and "Tan C. Dau" also identified Chin.  In addition, the government presented evidence that money

---

[2]This was Chin's second trial; his 2003 conviction on the same charges was overturned by the Second Circuit because credit card receipts that were probative of his alibi defense had been erroneously excluded by the district court.  *See United States v. Tin Yat Chin*, 371 F.3d 31 (2d Cir. 2004).

orders for the payment of rent for the "Tan C. Dau" office were bought at post offices in Chin's neighborhood where Chin lived, that a phone card used at the "Tan C. Dau" office was also used at pay phones near Chin's home, and that several of the calls made with the phone card were to victims of the scheme.

Some of the victims testified that the person they paid to obtain visas had spoken to them in Mandarin, while others testified that he spoke to them in Cantonese with a Mandarin accent. Chin's former co-workers at the Immigration and Naturalization Service ("INS") testified that he spoke fluent Mandarin. Some victims testified that the swindler held papers in an unusual manner, clamping them between the knuckles of his first and second fingers; the government argued during summation that Chin did this to keep his fingerprints off the documents. Government witnesses also testified that the swindler sold jewelry.

Of the 14 victims who identified Chin, 12 had dealings with him exclusively in the United States. *See, e.g,* Trial Tr. at 770-74 (Hui Chang Situ testifying that she met with "Mok Wah" in Chinatown in March 1997); *id.* at 582-87 (Jian Xie testifying that she met with "Tan C. Dau" in Brooklyn in June 1998). Two victims of "Tan C. Dau," however, testified that they met with Chin in China on specific dates in July 1999.

First, Cha Hoang Dang ("Dang") testified that she met with Chin at the Dong Fong Hotel in Guangzhou, China, on July 8, 1999, where they argued about how much money she owed him. She then flew to Hangzhou, China on July 22, 1999, and met Chin there to pay him $50,000.

Second, Jin Quan Xian ("Xian"), testified that he met with Chin in Hangzhou late at night on July 25, 1999; at the meeting, Xian gave Chin more than $32,000. Xian also met with Chin early the next day (i.e., July 26, 1999) to deliver photographs for the visas Chin was ostensibly obtaining for him.

In addition to those two victims, Wan Yi Li ("Li"), the secretary of "Tan C. Dau," also placed Chin in China in July 1999. Li testified that she met with Chin at the Dong Fong Hotel at approximately 6:30 a.m. on July 7, 1999. On July 8th, Li met Chin at the Lau Fau Hotel -- also in Guangzhou -- where he asked her to make a phone call to someone named "Mrs. Huang." Later that day, Li and Chin met with a "Mrs. Dang" at the Lau Fau Hotel, where the three discussed immigration matters.[3] On July 10th, Li met Chin at the Dong Fong Hotel to give him $10,000 that "Mrs. Dang" had paid her; Li met Chin at the same place on July 12th to give him another $1,000 from "Mrs. Dang." On July 31st, Li flew from Guangzhou to Shanghai at Chin's request. Li met Chin at the Shanghai Airport and gave him $15,000 in cash from "Mrs. Dang." Chin then paid Li her salary and transportation costs. Li returned to Guangzhou the same day.

---

[3]"Mrs. Dang" is probably Cha Hoang Dang. Since, however, Li's testimony differs from Dang's as to the hotel at which the meeting occurs, the Court refers to the person about whom Li testified as "Mrs. Dang" rather than "Dang."

## 2. The Defendant's Case

In his effort to cast doubt on the reliability of the government's identification witnesses, Chin presented evidence from a linguistics expert to show that as a native Cantonese speaker, he would not be able to speak Cantonese with a Mandarin accent. As for his alibi defense, Chin presented evidence that he was in Queens, New York, during July 1999, when -- according to Dang, Xian and Li -- the swindler was in China. Although Chin did not testify, his wife, Sui Ngan Cho, testified that she saw Chin everyday in July and August of 1999, while his brother, Tin Sak Chin, testified that he saw Chin "almost every week" during the same period. Trial Tr. at 1266. Both testified that Chin had not traveled to China in many years.

In addition, Chin's neighbor, Lorna Drew Monteroso ("Monteroso"), testified that her son and Chin's daughter attended the same summer school during July and August of 1999, and that she saw Chin "every day that [her son] went to school" because they would alternate driving the children to and from school. *See id.* at 1191. The children attended school Monday to Thursday only. Monteroso could not remember precisely when she and Chin began their car-pool arrangement, although she thought that summer school started on July 6, that she talked to Chin the next day, and that they started their car pool the following day. *See id.* at 1198-99 (Monteroso stating that she "would say" that summer school started on July 6, but that she did not "know for sure").

The alibi evidence also included numerous credit card receipts from transactions in Queens, including (1) a receipt from K-Mart dated July 7, 1999; (2) a receipt from P.C. Richard dated July 8, 1999; and (3) six receipts from Key Foods dated, respectively, July 2, 8, 10, 18, 20, and 26, 1999. A handwriting expert retained by the defense testified that all of the receipts were

signed by Chin.[4]   In addition, P.C. Richard and Key Foods employees testified that the policy of both stores required identification for credit card transactions; however, on cross-examination, the witnesses could not confirm that Chin was the one who had made the purchases.

### 3. The Government's Rebuttal Case

In rebuttal, the government presented its own handwriting expert; he testified that the K-Mart and P.C. Richard receipts were "probably not" signed by Chin, and that the July 8th Key Foods receipt was "clearly not" signed by Chin.  With respect to the remaining Key Foods receipts, the government's expert could not say whether the signatures were Chin's.

## B.  Submissions Accompanying Chin's § 2255 Motion

In support of his claim of actual innocence, Chin submitted with his § 2255 motion four affidavits and two documents.  One of the affidavits casts the blame for the swindler's scheme on someone else; the remaining submissions were offered in further support of Chin's unsuccessful alibi defense.

---

[4]The receipts had been excluded from the 2003 trial as unauthenticated under Federal Rule of Evidence 901 because Chin had no evidence that he, rather than his wife, who was a joint holder of the credit cards, had signed them.  *See United States v. Chin*, 288 F. Supp. 2d 240, 241-42 (E.D.N.Y. 2003).  The Second Circuit held that the receipts were sufficiently authenticated and admissible as non-hearsay, and that their exclusion was not harmless error because they supported Chin's alibi.  *See United States v. Chin*, 371 F.3d 31 (2d Cir. 2004).

### 1. *The Chiu Kuen Wong Affidavit*

An affidavit from Chin's friend, Chiu Kuen Wong, identifies a man named Frank Kan. Wong states that Kan has "lost half of one of his fingers, either . . . the index or middle finger," has made "several trips to China," and was trained in watch repair; he further attests that he "ha[s] been told that [Kan] sold jewelry." Chiu Kuen Wong Aff. at 1-2. Chin reasons that Kan is "likely the real culprit" because the swindler sold jewelry and traveled to China, and because a missing digit could explain the unique way the swindler held papers. *See* Movant's Mem. of Law at 22.

### 2. *The Shehan Chin Affidavit*

Chin's daughter, Shehan Chin, was seven years old in 1999. She did not testify at either of Chin's trials. Her affidavit states that Chin drove her to summer school and swimming practice in Queens regularly during July and August of 1999, and that she saw "Chin every[ ]day in July and August of 1999 in Queens." Shehan Chin Aff. ¶ 11. She gives several specific dates when Chin drove her to various places during that period. Some dates are marked by significant events such as the first day of summer school (July 7th), a dentist appointment (July 14th), a class party (July 23rd), and a class field trip (July 28th); others are not accompanied by any recollection benchmarks. *See id*. at ¶ 5 ("My father drove me to school and picked me up alone on July 7, 8, and 9, 1999.").

### 3. *The Log*

Chin submitted two pages of a handwritten log recording his activities as superintendent for the building in which he lived; the pages contains entries ranging from June 27, 1999 to December 3, 1999. It is not clear whether these two pages are part of a larger document and, if so, what constitutes the full extent of the original log. The relevant entries describe working on a water pipe on July 3rd and 4th; washing the floor on July 11th; making phone calls about a

shade on July 12th and 13th; and calling the utility company about the gas meters on July 14th. Chin's wife has submitted an affidavit attesting that the log is in Chin's handwriting and that the entries were made "at or near the time that the service [was] performed." Siu Ngan Cho Aff. at 1. Some of the entries do not appear on the pages of the log in chronological order, however, making it unlikely that they were all recorded on the day the activity was performed.

### 4. The Vee Affidavit and Receipt

A receipt from Chin's mechanic, Joseph Vee ("Vee"), shows that repair work was done on Chin's car on July 30, 1999.[5] Chin's name does not appear on the receipt, and there is nothing on the face of the document to connect it to Chin. In an accompanying affidavit, however, Vee attests that Chin personally brought the car in on July 30th. Vee further states that he has "known Tin Yat Chin for approximately thirty (30) years," Vee Aff. ¶ 4, and that he has "never done any service on Tin Yat Chin's vehicle when he was not present," *id.* ¶ 9.

### C. Further Affidavits Submitted After Oral Argument

At oral argument, the Court afforded Chin the opportunity to submit an affidavit stating that he had alerted his trial counsel to the existence and significance of the log and the receipt from Vee's garage. In response, Chin submitted two affidavits in which he and his brother attest that Chin's trial attorney, Lloyd Epstein ("Epstein") was given several boxes' worth of papers from Chin's study, and that the log and the receipt were among those papers. *See* Tin Yat Chin Aff. ¶ 7; Tin Sik Chin Aff. ¶¶ 7, 9. The affidavits make no mention of whether anyone informed Chin's counsel of Vee's existence or his potential value as an alibi witness.

Although Chin averred in his affidavit that he performed the activities listed in the

---

[5]Travel time and time-zone differences make it impossible for Chin to have been in Queens on July 30th and in Shanghai on July 31st.

log, *see* Tin Yat Chin Aff. ¶ 4 ("I maintained a log book of my daily activities in my rental apartment."), he did not mention that he personally took his car to Vee's garage on July 30, 1999, or that he was with his daughter in Queens on the dates she mentioned in her affidavit.

**D. Summary: Trial Evidence vs. § 2255 Submissions**

In sum, Chin's new evidence points the inculpatory finger at someone else and bolsters the alibi evidence presented at trial. It also adds two new dates when Chin claims he was in New York but government witnesses testified that he was in China.

Thus, at trial, the jury heard evidence from the government that Chin was in China on July 7, 8, 10, 12, 22, and 31, 1999, while Chin presented testimony at the trial from three witnesses—his wife, brother, and neighbor—that he was in Queens during that entire period. The neighbor's testimony specifically referred to July 7 and 8, while the credit card receipts conflicted with the testimony that Chin was in China on July 7th, 8th and 10th.

As for the § 2255 submissions, Chin's daughter's affidavit bolsters the trial alibi evidence that Chin was not in China during the entire summer of 1999; it specifically lists, *inter alia*, July 7th, 8th, and 9th. The log entry for work done in Queens on July 12th and evidence from Vee that Chin was in Queens on July 30th conflict with the government's evidence that he was in China on July 12th and 31st.

## II

**A. Actual Innocence**

Chin asserts a "freestanding" actual-innocence claim—that is, one not based on any constitutional infirmity at trial other than the conviction of an innocent person. *See* Movant's Mem.

of Law at 25-29.[6]  One would think that the issue of whether actual innocence constitutes a ground for *habeas* relief would have been definitively resolved by the Supreme Court, but that is decidedly not the case.  The current posture of the law has most recently been explained by the high court in *House v. Bell*, 547 U.S. 518 (2006), a *habeas* challenge to a state capital conviction.  In *House*, the petitioner raised actual innocence both as a stand-alone claim and as a "gateway" to reaching his procedurally defaulted constitutional claims.  *See id.* at 554.

In respect to the petitioner's "gateway" claim, *House* explained that the Court had previously ruled in *Schlup v. Delo*, 513 U.S. 298 (1995), that the miscarriage-of-justice exception allowing federal *habeas* review of procedurally defaulted constitutional claims embraced claims of innocence based on newly discovered evidence.  *See* 547 U.S. at 536-37.  It reiterated that the *Schlup* standard "does not require absolute certainty about the petitioner's guilt or innocence," *id.* at 538; rather, "[a] petitioner's burden at the gateway stage is to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt."  *Id.*

In applying *Schlup*, the high court emphasized two aspects of the standard particularly pertinent to the role of the district court: (1) that while the gateway claim requires "new reliable evidence . . . not presented at trial," a *habeas* court must assess the likely impact of "all the evidence" on reasonable jurors, 547 U.S. at 537 (quoting *Schlup*, 547 U.S. at 324, 327); and (2) that the gateway standard is not equivalent to the standard established by *Jackson v. Virginia*, 443 U.S. 307 (1979), governing claims of insufficient evidence, "because a *Schlup* claim involves evidence

---

[6]Chin has not moved for a new trial pursuant to Federal Rule of Criminal Procedure 33(b)(1), and he is barred by the three-year limitations period in that rule from making such a motion.

the trial jury did not have before it." *Id.* at 538. Consequently, "the inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record." *Id.* Describing the issue as "close," the Court concluded that the petitioner had met the *Schlup* standard.

In respect to the free-standing innocence claim, *House* recounted that in *Herrera v. Collins*, 506 U.S. 390 (1993), also a state capital case, the Court had assumed, without deciding, that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." 547 U.S. at 554 (quoting *Herrera*, 506 U.S. at 417). The Court further noted that it had opined in *Herrera* that "[t]he threshold showing for such an assumed right would necessarily be extraordinarily high," *id. (*quoting *Herrera*, 506 U.S. at 417), and that the evidence in *Herrera* had fallen far short of that standard.

In *House,* the Supreme Court declined to resolve the open issue raised in *Herrera*. It is unclear, however, what precisely it believed that issue to be since it alluded to Justice O'Connor's concurrence in *Herrera*, which framed the issue broadly -- without reference to capital cases -- as "whether federal courts may entertain convincing claims of actual innocence." 547 U.S. at 554 (quoting *Herrera*, 506 U.S. at 427 (O'Connor, J., concurring)). In any event, the Court concluded, as it had in *Herrera*, that the petitioner had not satisfied "whatever burden a hypothetical freestanding innocence claim would require," *id.* at 555; once again, it did not elaborate on the nature of that burden, other than to note that it would be "extraordinarily high," *id.* (quoting *Herrera*, 506 U.S. at 417), and would require "more convincing proof of innocence than *Schlup.*" *Id.*

What then is the present status of the law in light of *House* and *Herrera* when *habeas* review is sought to establish a petitioner's innocence? What is clear is that whether or not a claim of innocence rises to the level of a stand-alone issue, it can nonetheless serve as a basis, under the

standard established in *Schlup,* for relieving a petitioner from a state procedural rule which would otherwise bar federal *habeas* review of constitutional claims.

It is no wonder, in light of the reluctance of the Supreme Court to speak definitively, that there is no uniform understanding amongst lower courts as to the viability of a free-standing innocence claim. *Compare Ortiz v. Barkley*, 558 F. Supp. 2d 444, 458 (S.D.N.Y. 2008) ("[A]ctual innocence is not itself a constitutional claim.*"), and Arce v. Comm'r of Corr. Servs.*, 2007 WL 2071713, at *4 (E.D.N.Y. July 17, 2007) ("Here, petitioner grounds his habeas petition solely on a stand-alone actual innocence claim, and it therefore fails to state a ground for federal habeas relief."), *with Sacco v. Greene*, 2007 WL 432966, at *7 (S.D.N.Y. Jan. 30, 2007) (reasoning that *Herrera* does not foreclose freestanding claim of actual innocence, even in non-capital cases), *and White v. Keane*, 51 F. Supp. 2d 495, 502-03 (S.D.N.Y. 1999) (positing that a "liberal application" of *Herrera* allows *habeas* relief when new evidence is "so compelling that it would be a violation of the fundamental fairness embodied in the Due Process Clause not to afford a defendant a new trial at which the evidence could be considered" (citation omitted)).[7]

Even among courts that have embraced the notion of a free-standing innocence claim, confusion exists as to the precise quantum of proof that would be required to meet the "exceptionally high" burden of *Herrera. See, e.g. Sacco,* 2007 WL 432966 at *7 (holding that petitioner must prove

---

[7]The Second Circuit addressed the viability of a free-standing actual innocence claim in 2003, three years before *House* was decided. *See Ortega v. Duncan*, 333 F.3d 102 (2d Cir. 2003). In *Ortega*, the circuit court quoted *Herrera*'s observation that a claim "based on newly discovered evidence ha[s] never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding," *id*. at 108 (quoting *Herrera*, 506 U.S. at 400); however, it then held that the petitioner's conviction violated due process because it was based on perjured testimony. *See id.* at 109. Since the court granted the petition based on a meritorious constitutional claim, it was not required to posit the existence of a free-standing claim or determine the standard of proof required for such a claim.

by clear and convincing evidence that "no reasonable juror would find him guilty beyond a reasonable doubt in light of all the available evidence"); *White*, 51 F. Supp. 2d at 502-03 (requiring new evidence to be "so compelling that it would be a violation of the fundamental fairness embodied in the Due Process Clause not to afford a defendant a new trial at which the evidence could be considered"); *Osborne v. Dist. Attorney's Office*, 521 F.3d 1118, 1130-31 (9th Cir. 2008) ("[A] habeas petitioner asserting a freestanding innocence claim must go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent." (citation omitted)); *Cornell v. Nix*, 119 F.3d 1329, 1335 (8th Cir. 1997) (petitioner's burden is to show "new facts that unquestionably establish the petitioner's innocence, [and] is at least as exacting as the clear and convincing evidence standard, and possibly more so").

How, then, should the present case be decided? Despite the lack of a clear answer as to whether a freestanding actual innocence claim exists, it is possible to draw with relative certainty two conclusions about the nature of such a claim.

First, dicta in *Herrera* suggests that if an freestanding actual innocence claim exists, it must be based on newly discovered evidence that "could not reasonably have been presented to the . . . trier of facts." 506 U.S. at 400 (quoting *Townsend v. Sain*, 372 U.S. 293, 317 (1963)). Similarly, a "gateway" claim under *Schlupp* – the theoretical floor of an actual innocence claim – requires "new reliable evidence . . . that was not presented at trial." 513 U.S. at 324. Finally, limiting the grounds for a freestanding actual innocence claim to newly discovered evidence follows logically from the claim's theoretical purpose as an avenue of last resort. If evidence of actual innocence is available at the time of trial, it should be presented to the jury (or, as here, form the basis of an ineffective assistance claim if it is not); if it becomes available within three years after trial, then it may form the basis of a motion for a new trial under Federal Rule of Criminal Procedure

33(b)(1).

Second, with respect to the "extraordinarily high"-- but otherwise undefined -- burden of making out a freestanding claim of actual innocence, *House* instructs that the burden at least "requires more convincing evidence of innocence than *Schlup*," 547 U.S. at 555; that is, the claimant must go beyond (how far beyond is unclear) the already difficult task of demonstrating that "more likely than not any reasonable juror would have reasonable doubt." *Id.* at 538.

With those two principles in mind, the Court addresses the evidence offered by Chin.

## 1. The Additional Alibi Evidence

Chin's "new" alibi evidence was all available at the time of trial . Chin was obviously aware that his daughter could testify that he drove her to summer school; both the log and the mechanic's receipt were in existence and ostensibly in Epstein's possession. As a result, this evidence cannot support a freestanding actual innocence claim.

Even assuming that the new alibi evidence could not have been discovered until the time for filing a Rule 33(b)(1) motion had expired, it is not "sufficiently convincing evidence of innocence" to satisfy *Herrera*'s heightened standard. In that regard, the new alibi evidence must be compared with the evidence presented at trial. *See Herrera*, 506 U.S. at 418 (stating that new evidence "must be considered in light of the proof of petitioner's guilt at trial"). For the most part, the new evidence is cumulative of the alibi evidence presented at trial. Both the log and Shehan Chin's affidavit present substantially the same alibi that Chin's wife, brother, and neighbor offered at trial, although they add two specific dates (July 9th and 12th) that conflict with the government's evidence. Moreover, the log was written by Chin and is therefore self-serving. Shehan Chin's statements can be questioned based on the difficulty a child would have remembering such distant events, as well as her close relationship to Chin. Such evidence is no more persuasive of Chin's

innocence than the alibi evidence rejected by the jury.

The mechanic's affidavit, on the other hand, is not cumulative of the alibi evidence elicited at trial. It consists of a new witness -- Vee -- who places Chin in Queens the day before Li said she met with "Tan C. Dau" in Shanghai. *See* Trial Tr. at 135. It is questionable whether the conflict between Li and Vee's testimony would have, more likely than not, created reasonable doubt in *any* reasonable juror because it would not be unreasonable for a juror simply to credit Li's testimony over Vee's.

More importantly, the alibi evidence now offered by Chin concerns his whereabouts in July 1999. As such, it contradicts the testimony of only three witnesses --
Dang, Xian and Li. Neither Chin's new alibi evidence nor the evidence he presented at trial calls into question the testimony of the four government witnesses who testified that Chin (as "Tan C. Dau") had swindled them in New York in 1998. Nor does it contradict the testimony of the *eight* victims of "Mok Wah," all of whom testified that they had met with Chin in New York in 1997.

## 2. The Chiu Kuen Wong Affidavit

Unlike the new alibi evidence, it is not clear that the Chiu Kuen Wong affidavit was, or with the exercise of due diligence would have been, available at the time of trial or within three years thereafter. Even assuming that it was not, it would not support a freestanding actual innocence claim. Far from providing a "compelling identification of the real culprit," Movant's Mem. of Law at 21, the Chiu Kuen Wong affidavit offers a vague description of a man who allegedly shares two characteristics with the swindler—he has worked in the jewelry business and traveled to China—characteristics that thousands of residents of New York City likely share. The man is also missing part of one of his fingers, but no witness ever described the swindler as missing a finger. Although a missing finger could conceivably explain the swindler's unusual manner of holding

papers between his first two fingers, it is more likely that a man missing half of either his index or middle finger would find it *more difficult* to hold a piece of paper between those two fingers than someone with intact fingers, and would presumably hold papers between one finger and his thumb. At best, the Chiu Kuen Wong affidavit describes someone who shares a few characteristics with the swindler; this is hardly enough to definitively incriminate the man described.

## B. Ineffective Assistance of Counsel

Chin's ineffective assistance claim—that Epstein should have discovered and presented the allegedly new evidence at trial — is governed by the two-prong test of *Strickland v. Washington*, 466 U.S. 668 (1984): Chin must show both (1) "that counsel's representation fell below an objective standard of reasonableness," *id.* at 688, and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. "The burden of establishing both constitutionally deficient performance and prejudice is on the defendant." *United States v. Birkin*, 366 F.3d 95, 100 (2d Cir. 2004).

"Judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Knowles v. Mirzayance*, 129 S.Ct. 1411, 1420 (2009) (quoting *Strickland*, 466 U.S. at 689) (citation and internal quotation marks omitted). "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S at 691. An attorney's performance may be deficient if he or she fails to attempt to investigate alibi witnesses of whom he or she is aware in order to determine whether their testimony should be presented at trial. *See Bryant v. Scott*, 28 F.3d 1411, 1416-18 (5th Cir. 1994) (holding that counsel's failure to investigate alibi witnesses of which he was aware before trial was deficient performance);

*Lawrence v. Armontrout*, 900 F.2d 127, 129 (8th Cir. 1990) ("[O]nce [the petitioner] provided his trial counsel with the names of potential alibi witnesses, it was unreasonable of her not to make some effort to interview all these potential witnesses to ascertain whether their testimony would aid an alibi defense.").

      After considering all the evidence and arguments Chin advances in support of his ineffective assistance claim, the Court concludes that they do not rise to the level of ineffective assistance under *Strickland.*[8]

---

[8]The Court carefully considered whether to hold an evidentiary hearing to afford Epstein an opportunity to defend his conduct. *See Wilson v. Mazzuca* 570 F.3d 490, 497 (2d Cir. 2009) ("We believe that a district court facing the question of constitutional ineffectiveness of counsel should, except in highly unusual circumstances, offer the asserted ineffective attorney an opportunity to be heard and to present evidence, in the form of live testimony, affidavits, or briefs." (quoting *Sparman v. Edwards*, 154 F.3d 51, 52 (2d Cir. 1998))). Because, however, Chin has not carried his initial burden of averring facts sufficient to give rise to a plausible ineffective assistance claim, an evidentiary hearing would be an unnecessary burden on Epstein's time and the Court's judicial resources. *See United States v. Tarricone*, 996 F.2d 1414, 1418 (2d Cir. 1993) ("To prevail on his motion for a[n evidentiary] hearing, Barberio must establish that he has a 'plausible' claim of ineffective assistance of counsel.").

### 1. *The Chiu Kuen Wong Affidavit*

Chin argues that Chiu Kuen Wong was a friend of Chin "and easy to locate," Movant's Mem. of Law at 44, but offers no evidence that Epstein knew who Chiu Kuen Wong was or what exculpatory evidence he might provide. Furthermore, as explained above, the Chiu Kuen Wong affidavit is too vague to exculpate Chin; therefore, Chin cannot have been prejudiced by the absence of Chiu Kuen Wong's testimony at trial.

### 2. *The Shehan Chin Affidavit*

Epstein was clearly aware of Shehan Chin's relevance to her father's alibi defense, since he presented testimony from Chin's neighbor that Shehan Chin and the neighbor's son went to summer school together. However, Chin has not offered any evidence showing that Epstein failed to investigate Shehan Chin as a possible defense witness. He has not, therefore, carried his burden of overcoming the strong presumption that his attorney's performance was reasonable. Epstein could have reasonably decided, for example, not to present Shehan Chin's testimony because of her relationship to Chin. *See Seymour v. Walker*, 224 F.3d 542, 556 (6th Cir. 2000) (holding that counsel's failure to call defendant's sister was not deficient performance even though her testimony might have "bolstered" the defense because she "would likely be considered by the jury to be biased"); *Johnson v. Mann*, 1993 WL 127954, at *1 (S.D.N.Y. Apr. 20, 1993) ("[C]ounsel made the strategic decision[ not] to rely on the inherently suspect testimony of family members."). He could have also reasonably decided not to rely on the questionable memory of a witness who was seven years' old at the time of the events in question and whose testimony would have been substantially the same as Chin's other alibi witnesses, in particular his neighbor.

Furthermore, Chin implies that Shehan Chin was unwilling to testify at the time of the trial because she did not want to testify at the first trial. *See* Movant's Reply Mem. of Law at

12 (noting her youth and stating that she was unwilling to testify at the 2003 trial). "Counsel cannot be considered ineffective because alibi witnesses . . . were unwilling to testify." *Hamilton v. Herbert*, 2004 WL 86413, at *16 (E.D.N.Y. Jan. 16, 2004) (quoting *People v. Hamilton*, 708 N.Y.S.2d 136, 136 (2d Dep't 2000)).

### 3. The Log

Chin has averred that the log was among the raft of papers given to Epstein, but has not stated that anyone singled it out for Epstein's attention or explained its significance. Moreover, Chin offers no evidence to rebut the presumption, required under *Strickland*, that Epstein "made all significant decisions in the exercise of reasonable professional judgment." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986). Not to present at trial a record made by the defendant and, therefore, likely to be viewed by the jury as self-serving hardly qualifies as an unreasonable judgment. *Cf. Arkin v. Bennett*, 282 F. Supp. 2d 24, 38 (S.D.N.Y. 2003) ("[A] court 'will practically never second-guess' an attorney's decision to present or withhold a witness." (quoting *United States ex rel. Walker v. Henderson*, 492 F.2d 1311, 1314 (2d Cir. 1974)).

It bears repeating this is not a case in which an alibi defense was ignored. Epstein presented testimony and documentary evidence to the effect that Chin was in Queens in the summer of 1999. Although they were rejected by the jury, both the credit card receipts and the testimony of Chin's neighbor are more compelling than Chin's own handwritten record of his activities that summer. *See Osorio v. Conway*, 496 F. Supp. 2d 285, 304 (S.D.N.Y. 2007) ("Counsel is not required to present every nonfrivolous defense, but instead, should 'winnow out weaker arguments' and select witnesses and evidence that reflect counsel's strategy." (quoting *Jones v. Barnes*, 463 U.S. 745 (1983))).

### 4. The Vee Affidavit and Receipt

Finally, Chin argues that Epstein's failure to find and interview Vee constituted ineffective assistance. Although Chin has averred that his wife gave the receipt from Vee's garage to Epstein (along with every other document in Chin's study), he has not presented any evidence that anyone explicitly informed Epstein that Vee was a potential alibi witness. Epstein cannot be faulted for not further investigating a document that shows only that repair work was done in Queens on July 30, 1999. Nothing on the face of the receipt shows that Chin personally visited the mechanic that day. Nor does the receipt reveal Vee's identity, how well he knows Chin, or his potential value as an alibi witness. Since the receipt did not inform Chin's attorney that Vee was a potential alibi witness, and since there is no evidence that Epstein was otherwise made aware of Vee's existence, Epstein committed no error by not finding and interviewing Vee. *See Strickland*, 466 U.S. at 691 ("[W]hat investigation decisions are reasonable depends critically on [the] information [provided by the defendant].").

Even assuming that Epstein should have introduced all of the alibi evidence now proffered by Chin, Chin has not established prejudice. As explained in connection with Chin's claim of actual innocence, his new alibi evidence -- like the alibi evidence introduced at trial -- addresses only a handful of specific dates out of a scheme that, according to the government's evidence, lasted for three years. There is, therefore, no reasonable probability that the additional alibi evidence would have led to a different outcome at trial.

**D. Motion to Amend**

Almost eleven months after filing his petition, Chin moved to amend the petition to include a claim that his Fifth Amendment rights were violated by the government's delay in indicting him; he argues that the delay caused him to forget that his mechanic could be a valuable alibi witness. The last criminal act alleged in the indictment occurred in August 1999, and a witness

brought the government's attention to Chin in October 1999. Chin was not aware of the charges

until he was arrested in November 2001.            A *habeas* petition "may be amended or

supplemented as provided in the rules of procedure applicable to civil actions." 28 U.S.C. § 2242;

*see also Ching v. United States*, 298 F.3d 174, 180 (2d Cir. 2002) ("[T]he application of Fed. R. Civ.

P. 15 to habeas petitions and § 2255 motions would not frustrate the AEDPA's goals, even if the

motion

to amend is brought late in the proceedings."). While Federal Rule of Civil Procedure 15 provides

that "leave to amend shall be freely given when justice so requires," Fed. R. Civ. P. 15(a), "a district

court may properly deny leave when amendment would be futile," *Jones v. New York State Div. of*

*Military & Naval Affairs*, 166 F.3d 45, 50 (2d Cir. 1999).

      "[T]he Due Process Clause of the Fifth Amendment would require dismissal of the

indictment if it were shown . . . that the pre-indictment delay . . . caused substantial prejudice to [the

defendant's] rights to a fair trial and that the delay was an intentional device to gain tactical

advantage over the accused." *United States v. Marion*, 404 U.S. 307, 324 (1971). "A defendant

bears the 'heavy burden' of proving both that he suffered actual prejudice because of the alleged

pre-indictment delay and that such delay was a course intentionally pursued by the government for

an improper purpose." *United States v. Cornielle*, 171 F.3d 748, 752 (2d Cir. 1999).

      "Prejudice in this context has meant that sort of deprivation that impairs a defendant's

right to a fair trial. This kind of prejudice is commonly demonstrated by the loss of documentary

evidence or the unavailability of a key witness." *Cornielle*, 171 F.3d at 752 (citation omitted). Chin

argues that the pre-indictment delay of over two years prejudiced him because the delay "dulled

memories and impaired counsel's investigation," Mot. to Amend at 1, preventing the discovery of

the mechanic's alibi evidence, *see* Reply in Supp. of Mot. to Amend at 2.[9]  Chin does not explain

exactly how the passage of time prevented Epstein from discovering Vee — perhaps he means that

he neglected to tell Epstein about Vee because his own memory of having his car serviced in 1999

had faded.  If so, Chin's argument is not about the loss of evidence or the unavailability of a witness,

but simply that he forgot about a witness who could have aided his defense.

        In any event, the Court need not decide the prejudice issue.  Even if Chin were able

to show prejudice resulting from the delay, he offers no evidence that "the prosecutor *deliberately*

used the delay to achieve a substantial tactical advantage."  *United States v. Scarpa*, 913 F.2d 993,

1014 (2d Cir. 1990)  (emphasis added) (finding no due process violation where defendant made "no

specific allegation of misconduct on the part of the prosecution").  In fact, Chin does not even *allege*

an improper motive on the government's part; he merely "requests an evidentiary hearing on this

matter."  Reply in Supp. of Mot. to Amend at 2.

        The government claims that the time between October 1999 and Chin's indictment

was spent investigating the case:

> [T]he government conducted an extensive investigation of the
> allegations contained in the indictment, including but not limited to,
> showing photo arrays to witnesses and victims; interviewing
> witnesses and victims; identifying and locating new witnesses and
> victims; and obtaining receipts from witnesses and victims.

Opp'n to Mot. to Amend at 6.  "[T]o prosecute a defendant following investigative delay does not

---

[9]Chin also seems to argue that he was prejudiced in his presentation of the credit card receipts by not being able to accompany them with "testimony by a witness with personal knowledge that Mr. Chin had signed the receipts." Mot. to Amend at 3.  However, he does not identify any such witnesses or explain how the pre-indictment delay might have contributed to their unavailability.  *See United States v. Iannelli*, 461 F.2d 483, 485 (2d Cir. 1972) (finding contention that defendant might have found witnesses to contradict government witness's version of events "too speculative for [the court] to say that [he had] been deprived of a fair trial").

deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time." *United States v. Lovasco*, 431 U.S. 783, 796 (1977). In addition, the Court must assume that the government's representations as to the nature of the delay "have been made in good faith." *Id.* Since Chin provides neither allegations nor evidence to refute the government's representations, he cannot prevail on a claim that his Fifth Amendment rights were violated by pre-indictment delay. Granting him leaving to amend his § 2255 motion to add such a claim would, therefore, be futile.

## III

Chin's § 2255 motion is denied, as is his motion to amend. A certificate of appealability will not issue because Chin has failed to make a substantial showing of the denial of a federal right. *See* 28 U.S.C. § 2253.

**SO ORDERED**.

_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
October 15, 2009